# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

DONALD BROADNAX,          )
)
    Petitioner,         )
)
vs.               )      **CASE NO.  2:13-CV-1142-AKK**
)
JEFFERSON  S.  DUNN,  )
**Commissioner, Alabama Department**  )
**of Corrections,**        )
)
    Respondent.        )

## MEMORANDUM OPINION

This case is before the court on Donald Broadnax's Petition for Writ of Habeas Corpus by Prisoner in State Custody Under Death Sentence Pursuant to 28 U.S.C. § 2254. Doc. 1.[1] Broadnax stands convicted of four counts of capital murder for the murders of his wife, Hector Jan Stamps Broadnax, and her grandson, DeAngelo Stamps. In his Petition, Broadnax seeks relief from this conviction. After careful consideration, the Petition, doc. 1, is due to be denied.

---

[1]"Doc. ___" refers to the docket number assigned to each document filed in the court's electronic filing system.  Citations to the state-court record, (doc. 12), reflect the volume, tab, and page numbers assigned by respondent.

# I.  BACKGROUND

The Alabama Court of Criminal Appeals ["ACCA"] set forth the following with regard to the offense conduct and the proceedings:

> In 1997, Broadnax was convicted of four counts of capital murder for the beating deaths of his wife, Hector Jan Stamps Broadnax, and her four-year-old grandson, DeAngelo Stamps.  The murders were made capital (1) because two or more persons were murdered pursuant to one scheme or course of conduct, see § 13A-5-40(a)(10), Ala. Code 1975; (2) because Broadnax had been convicted of another murder in the 20 years preceding those murders, see § 13A-5-40(a)(13), Ala. Code 1975; (3) because the murders were committed during the course of a kidnapping, see § 13A-5-40(a)(1), Ala. Code 1975; and (4) because DeAngelo Stamps was under 14 years of age at the time of his death, see § 13A-5-40(a)(15), Ala. Code 1975.  The jury unanimously recommended that Broadnax be sentenced to death for his convictions, and the trial court followed the jury's recommendation and sentenced Broadnax to death.  [The ACCA] affirmed Broadnax's convictions and sentence on appeal, *Broadnax v. State*, 825 So. 2d 134 (Ala. Crim. App. 2000), and the Alabama Supreme Court affirmed this Court's judgment, *Ex parte Broadnax*, 825 So. 2d 233 (Ala. 2001). . . . The United States Supreme Court denied certiorari review on June 28, 2002.  *Broadnax v. Alabama*, 536 U.S. 964, 122 S. Ct. 2675, 153 L. Ed. 2d 847 (2002).

> In this Court's opinion affirming Broadnax's convictions and sentence, we set out the facts of the crimes as follows:

> > ". . .  In April 1996, Donald Broadnax, who had been convicted in 1978 for murder and who was serving a sentence of 99 years' imprisonment, was residing at a work release center in Alexander City and working at Welborn Forest Products in Alexander City.  In 1995 Broadnax married Hector Jan Stamps Broadnax, who at the time of the marriage had a three-year-old grandson, DeAngelo Stamps.  Broadnax and Jan were having marital problems and Broadnax believed that Jan was partially

responsible for a recent denial of parole.[2]  The evidence indicated that after 6:00 p.m. on April 25, 1996, Jan and DeAngelo delivered food to Broadnax at his workplace.  Johnny Baker, an inmate at the work release center and Broadnax's coworker at Welborn, testified that he saw Broadnax driving Jan's car at Welborn that evening.  According to Baker, Broadnax stopped to talk with him and he saw a child in a child's safety seat in the backseat.  Baker testified that he was 'pretty sure' the child was alive when he talked with Broadnax.

"At approximately 10:45 p.m. that same night, Mark Chastain, a [leadman] at Welborn, found Broadnax inside a building while securing the building for the night.  Chastain testified that he told Broadnax that the alarm had been set and that they had to exit the building.  According to Chastain, when he asked Broadnax why he was still in the building, Broadnax stated that the work release van had dropped him off . . . .

"Kathy Chastain, Mark Chastain's wife, testified that while she was outside the building waiting for her husband to secure the building, she saw an individual matching Broadnax's description get out of a [white king-cab pickup truck] and run into the building.

"On April 25, 1996, Robert Williams and his wife were living across the street from a house in Birmingham that had in the past been used as a 'crack-house' and for prostitution.  On that evening as Williams and his wife left their house at approximately 8:20 p.m., they noticed no cars were parked at the house across the street.  When they returned at approximately 8:50 p.m., they saw a white Dodge Aries automobile parked behind the house.  Because of the previous illegal activities occurring at the house, Williams telephoned the police and reported the presence of the car.

---

[2]Broadnax was denied parole on April 15, 1996.  *See* doc. 12, Vol. 5 at 441.

"Alondo McCurdy and Donna Smith, officers for the Birmingham Police Department, responded to the call and arrived at the residence at approximately 9:00 p.m. When they approached the parked car, they noticed blood on the ground behind the car and on the bumper. Based on their observations, they immediately radioed their supervisor and the paramedics, and secured the scene. It was later determined that the car belonged to Jan Broadnax.

"When the paramedics arrived, they opened the locked trunk and found the bodies of Jan and DeAngelo in the trunk. Both Jan and DeAngelo had been beaten. According to Dr. Robert Brissie, the forensic pathologist who performed the autopsies on the victims, blunt-force trauma, which could have been caused by the use of a piece of lumber such as the one found in the trunk with the bodies, caused the deaths of Jan and DeAngelo.

"On April 27, 1996, Lawrence Hardnette, an inmate resident at the work release center in Alexander City, found a work uniform that did not belong to him stuffed under his bunk. At about the same time, James Smith, another inmate resident of the work release center, found a pair of Red Wing brand work boots under his bunk. The uniform and the boots were turned over to the supervisors and were later identified as belonging to Broadnax. Broadnax was the only one at the work center who wore Red Wing work boots; there were also identifying marks on the work uniforms indicating that the uniforms had been issued to Broadnax. When the work uniform and the boots were examined, bloodstains were found on the uniform [and the boots]. The analysis of the bloodstains [on the uniform] indicated that the deoxyribonucleic acid ('DNA') in these bloodstains matched the DNA of Jan and DeAngelo.

"On the grounds at Welborn near a finishing products storage facility, employees found an earring that matched an earring found on the rear floorboard of Jan's car. The evidence

appeared to indicate that Jan was killed at Broadnax's workplace in Alexander City, that her body was placed in the trunk of the car, and that the car was driven to Birmingham. Officer Vince Cunningham of the Birmingham Police Department testified that while conducting the investigation, he traveled from the location where the bodies were found in Birmingham to Broadnax's workplace in Alexander City [several times and determined that the drive time was no more than one and one-half hours]. [Thus, a]ccording to Cunningham, Broadnax could have easily traveled the distance between the two locations within the time frame set out by the evidence."

825 So. 2d at 150-51.

In addition to the above, the State presented evidence at trial indicating that the piece of lumber found in the trunk of the vehicle with the victims was similar to the lumber used at Welborn and that a blue cloth similar to cloth used at Welborn was also found in the trunk of the vehicle. The State also presented evidence indicating that the blood spatter on the rear of the vehicle was consistent with a beating. The State presented testimony that a few days before the murders Broadnax had told a fellow employee at Welborn that he was upset with Jan regarding the denial of his parole, which had occurred on April 15, 1996, and that he was planning to kill Jan. The State also presented testimony regarding two statements Broadnax made to the police. In his statements, Broadnax said that Jan had brought him dinner at Welborn the night of the murders and that she had left Welborn at approximately 8:20 p.m. Broadnax also said that he had been at Welborn the entire day and evening of the murders, until approximately 10:45 p.m., and that he had telephoned his brother from Welborn at approximately 9:00 p.m. However, the State introduced telephone records indicating that no telephone call had been made to Broadnax's brother's house the night of April 25, 1996. When questioned specifically about the bloody boots and the Welborn work uniform belonging to him that were found in the work-release facility, Broadnax stated that he had sold the boots to another inmate, although he could not identify that inmate, approximately a year earlier and that the uniform had been stolen about

5

two months earlier. Broadnax also said that he had reported the theft of his uniform to the company who made and rented the uniforms to Welborn; however, the State presented testimony at trial that no report of a stolen uniform had been made to the uniform company.

*Broadnax v. State*, 130 So. 3d 1232, 1236-39 (Ala. Crim. App. 2013)(original footnotes omitted; footnotes added).

At trial:

The State's theory of the case was that between approximately 6:30 p.m. and 10:30 p.m. the night of April 25, 1996, Broadnax brutally beat his wife, Jan, to death at Welborn; put Jan's body in the trunk of her car; drove the car with Jan's grandson, DeAngelo, in the backseat, to Birmingham to a location near Elyton Village where Broadnax had grown up and presumably had friends; brutally beat DeAngelo to death in that location; placed DeAngelo's body in the trunk of the car with Jan's body; and found someone to drive him back to Welborn, where Mark and Kathy Chastain saw Broadnax around 10:30 p.m.

The defense's theory of the case was that Broadnax had been at Welborn all day and all evening on April 25, 1996 – as Broadnax had said in his statements to police – and that the State's evidence was insufficient to prove that Broadnax had committed the murders. Although the defense called no witnesses, they vigorously cross-examined the State's witnesses and called into question the State's time line of events as well as the credibility of the State's witnesses, some of whom were inmates themselves.

*Id*. at 1239.

The penalty phase of Broadnax's trial began immediately following the jury's verdict. *See* doc. 12, Vol. 8, Tab 20 at 299-302. The State relied on the evidence it presented during the guilt phase, and Broadnax offered the testimony of his sister,

Dorothy McKinstry. *See id.*, Tab 21 at 307; *id.*, Tab 22 at 308. The jury unanimously recommended a sentence of death, *Broadnax*, 825 So. 2d at 150, and the trial court followed the recommendation, *see* doc. 12, Vol. 1, Tab 2 at 22.

In its sentencing order, the trial court stated it had found the four aggravating circumstances offered by the State: (1) "the capital offense was committed by a person under sentence of imprisonment pursuant to 13A-5-49(1)," (2) "the capital offense was committed by the Defendant after he had previously been convicted of a felony involving the use . . . of violence to a person pursuant to 13A-5-49(2)," (3) "the capital offense was committed while the Defendant was engaged in the commission of . . . [k]idnapping pursuant to 13A-5-49(4)," and (4) "the capital felony was especially heinous, atrocious [or] cruel [HAC] pursuant to 13A-5-49([8])." *Id.* at 21. The court stated it had not found a statutory mitigating circumstance pursuant to Ala. Code § 13A-5-51(1), (4), (5), and (7), *id.* at 22, or any non-statutory mitigating circumstances, stating, *inter alia*, –

> No additional testimony was taken during the punishment phase of the proceedings as the attorneys for the Defendant advised the Court that the Defendant did not wish to present any evidence at the punishment phase. The Court specifically asked the Defendant if that was his wish and he said he did not wish to present any evidence at the evidentiary stage of the punishment phase. The Court then questioned the Defendant as to his request, determined that the request was knowingly made by the Defendant whereby he knowingly waive[d] his right to presentation of any evidence at the punishment phase.

7

*Id*. at 18-19.  The court found "beyond a reasonable doubt and to a moral certainty that the aggravating circumstances outweigh the mitigating circumstances and [are] sufficient to uphold the jury's recommendation of punishment at death."  *Id*. at 22.

On appeal, although the ACCA affirmed Broadnax's conviction and sentence, it remanded the case to the trial court to correct its sentencing order:

> The trial court's sentencing order does not acknowledge that [Dorothy] McKinstry testified and does not indicate what, if any, mitigating evidence was presented through her testimony.  In addition, the sentencing order does not specifically address the existence or nonexistence of each of the aggravating circumstances provided in § 13A-5-50, Ala. Code 1975; the existence or nonexistence of each of the mitigating circumstances provided in § 13A-5-51, Ala. Code 1975; or the existence or nonexistence of any nonstatutory mitigating circumstances provided in § 13A-5-52, Ala. Code 1975.

> After reviewing the trial court's sentencing order and the record on appeal, we agree with the state that remand is necessary for the trial court to correct certain errors and omissions in its sentencing order.  Therefore, this cause is remanded with instructions that the trial court 1) review those portions of the record concerning the penalty phase of trial, 2) make new findings regarding each of the aggravating circumstances and the mitigating circumstances, 3) weigh those aggravating and mitigating circumstances and determine whether the aggravating circumstances outweigh the mitigating circumstances, and 4) enter a proper sentencing order as required by § 13A-5-47(d), Ala. Code 1975.  No new sentencing hearing is required. . . .  The trial court is granted the authority to resentence Broadnax in the event the court determines that death is not the appropriate sentence.  See *Parker v. State*, 587 So. 2d 1072 (Ala. Cr. App.1991), aff'd, 610 So. 2d 1181 (Ala. 1992), cert. denied, 509 U.S. 929, 113 S. Ct. 3053, 125 L. Ed. 2d 737 (1993).  A return should be made to this Court within 35 days from the date of this opinion.

*Broadnax*, 825 So. 2d at 221-22 (footnote omitted).

The trial court filed a corrected sentencing order, which found, again, all four

aggravating circumstances offered by the State, and it noted:

> The especially heinous, atrocious, or cruel aggravating circumstance pursuant to § 13A-5-49(8) was well established [by the evidence] which showed that the victim, Hector J. Stamps, was brutally murdered in the presence of her grandson, DeAngelo Stamps, and immediately after the murder, the victim, DeAngelo Stamps's grandmother, was stuffed into the trunk of the automobile and driven from the scene of the first murder[,] approximately one and a half hours away[,] to the scene of the second murder where the four-year-old grandson, DeAngelo Stamps, was brutally murdered. The manner in which the death of the grandmother was caused in the presence of the four-year-old grandson and the manner in which the death of the four-year-old grandson ensued and the terror inflicted on the mind of the four-year-old grandson raises this crime to a conscienceless and pitiless crime which was unnecessarily torturous to the victim and, therefore, fell into the category of especially heinous, atrocious, or cruel.

*Id.* at 230-31 (Appendix A)(original alterations deleted; alterations added). The court

specifically addressed the statutory mitigating circumstances set forth in Ala. Code

§ 13A-5-51(1)-(7) and found none were present. *Id.* at 231-32. In this sentencing

order, the court addressed Dorothy McKinstry's testimony, finding that any

mitigating circumstance to which she may have testified "was greatly outweighed by

the aggravating circumstances . . . and that even . . . if [her testimony supported a

finding of] a mitigating circumstance, . . . it [was] totally outweighed by the

aggravating circumstances as presented by the evidence." *Id.* at 233. Thus, the court again upheld the jury's recommendation of a death sentence.

The ACCA affirmed. *Id.* at 226. And, the Alabama Supreme Court granted certiorari and affirmed.[3] The United States Supreme Court denied certiorari review. *Broadnax v. Alabama*, 536 U.S. 964 (2002).

Thereafter, Broadnax filed a petition for post-conviction relief pursuant to Ala. R. Crim. P. 32. *See generally* doc. 12, Vol 21, Tab 52 at 192-200 to Vol. 22 at 201-293. And, as the ACCA outlined,

> On September 24, 2003, the State responded to the petition. On September 26, 2003, the circuit court summarily dismissed several of the claims in Broadnax's petition and ordered Broadnax to amend several other claims to comply with the pleading requirements in Rule 32.3 and Rule 32.6(b). After obtaining multiple extensions, Broadnax filed his first amended petition on January 16, 2004, in which he incorporated all the claims from his original petition and expanded on some of those claims. On March 8, 2004, and March 10, 2004, respectively, the State responded to the first amended petition. On March 23, 2004, the circuit court summarily dismissed several of the claims in Broadnax's petition and scheduled an evidentiary hearing on the remaining claims.

---

[3]Among other things, the Alabama Supreme Court found that "[t]he trial court's instruction regarding the standard necessary for finding a mitigating circumstance was incorrect," *Ex parte Broadnax*, 825 So. 2d at 235, 237; that the error was harmless because the incorrect jury instruction "had no impact on the jury's recommendation or on the trial court's sentence of death." *Id.* at 237; and that the trial court's instruction – "regarding the . . . aggravating circumstance" – had not "resulted in an overbroad and arbitrary application of this aggravating circumstance," and that "[d]espite the fact that the trial court's instruction did not include the phrase 'compared to other capital offenses,' the instruction, when reviewed in its entirety, adequately narrowed this circumstance." *Id.*

On April 8, 2005, Broadnax filed a motion for leave to amend his petition, a motion for funds for a psychological evaluation and a sociological report, and a motion for discovery. On April 15, 2005, the State filed oppositions to all of Broadnax's motions, and the circuit court held a hearing on the motions the same day, after which it denied the motions. The circuit court held an evidentiary hearing on the remaining claims in Broadnax's first amended petition on May 23, 2005. On June 14, 2005, the circuit court issued an order denying the remaining claims in the first amended petition, and Broadnax appealed.

On appeal, [the ACCA] reversed the circuit court's judgment and remanded the case for further proceedings on the ground that the circuit court had erred in denying Broadnax's April 8, 2005, motion to amend his petition. *Broadnax v. State*, 987 So. 2d 631 (Ala. Crim. App. 2007). The Alabama Supreme Court denied the State's petition for certiorari review, and [the ACCA] issued a certificate of judgment on December 21, 2007.

*Broadnax*, 130 So. 3d at 1239-40.

Broadnax filed a second amended Rule 32 petition in May 2008. After an evidentiary hearing in 2011, the circuit court denied the petition, *see generally* doc. 12, Vol. 32, Tab 76, at 54-87, and Broadnax appealed. The ACCA affirmed, *Broadnax*, 130 So. 3d at 1268, and the Alabama Supreme Court denied certiorari review, *see id*. at 1232. Broadnax timely filed the instant § 2254 habeas petition. Doc. 1.

## II.  STANDARD OF REVIEW

As to any claim "adjudicated on the merits in State court proceedings," this court may not grant the § 2254 habeas petition –

> ". . . unless the adjudication of the claim –
>
> "(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  [42 U.S.C. § 2254(d).]
>
> In applying this "highly deferential standard for evaluating state-court rulings, . . . state-court decisions [must] be given the benefit of the doubt." [*Cullen v.*] *Pinholster*, 563 U.S. [170, 181], 131 S. Ct. [1388], at 1398 [(2011)](internal quotation marks omitted).  They must be reviewed solely on "the record that was before the state court that adjudicated the claim on the merits." *Id*., at [181] . . . .  And the prisoner must rebut any state court factual findings he seeks to challenge by clear and convincing evidence under § 2254(e)(1).  *Burt v. Titlow*, 571 U.S. [12, 18], 134 S. Ct. 10, 15, 187 L. Ed. 2d 348 (2013).

*Brumfield v. Cain*, 135 S. Ct. 2269, 2288-89 (2015).  The "backward-looking language" of § 2254(d) "requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court." *Cullen*, 563 U.S. at 182.  Also, "[s]tate court decisions are measured against [the Supreme] Court's precedents as of 'the time the state court renders its decision.'" *Id.* (quoting *Lockyer*

*v. Andrade*, 588 U.S. 63, 71-72 (2003)). "Deciding whether a state court's decision involved an unreasonable application of federal law[, § 2254(d)(1),] or was based on an unreasonable determination of fact[, § 2254(d)(2),] requires the federal habeas court to train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims, and to give appropriate deference to that decision." *Wilson v. Sellers*, 138 S. Ct. 1188, 1191-92 (2018)(internal quotations and citations omitted).

Section 2254(d) "preserves [this court's] authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with [the] Court's precedents. *It goes no further*." *Harrington v. Richter*, 562 U.S. 86, 102 (2011)(emphasis in original). "As a condition for obtaining habeas corpus from [this court, [Broadnax] must show that the state court's ruling on [his] claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond *any possibility* for fairminded disagreement." *Id*. at 103. "[T]he ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Virginia v. LeBlanc*, 137 S. Ct. 1726, 1728 (2017)(quoting *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015)(per curiam))(internal quotations omitted). In other words, "if *some* fairminded jurists could agree with the state court's decision, although others might disagree, federal

habeas relief must be denied." *Loggins v. Thomas*, 654 F.3d 1204, 1220 (11th Cir. 2011)(emphasis in original).  Nevertheless, "'[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" *Brumfield*, 135 S. Ct. at 2277 (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)).

"When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge." *Johnson v. Williams*, 568 U.S. 289, 303 (2013).  However,

> When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  That presumption stands unless rebutted by evidence from the state court's decision and the record that leads very clearly to the conclusion that the federal claim was inadvertently overlooked in state court.

*Pittman v. Sec'y, Fla. Dep't of Corr.*, 871 F.3d 1231, 1245 (11th Cir. 2017)(internal citations and quotations omitted).

The court need not determine in every instance whether AEDPA deference applies:

> Courts cannot grant writs of habeas corpus under § 2254 by engaging only in *de novo* review when it is unclear whether AEDPA deference applies, § 2254(d).  In those situations, courts must resolve whether

AEDPA deference applies, because if it does, a habeas petitioner may not be entitled to a writ of habeas corpus under § 2254(d). Courts can, however, deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, see § 2254(a).

*Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

## III.  DISCUSSION OF BROADNAX'S CLAIMS

Broadnax raises claims related to ineffective assistance of counsel (section A below), alleged improper instructions to the jury (sections B and C), alleged errors in the sentencing order (Section D), and alleged prosecutorial misconduct (Section E). The court addresses these claims below.

## A.  INEFFECTIVE ASSISTANCE OF COUNSEL

### 1.  Standard of Review

The "benchmark" for judging any claim that trial counsel provided ineffective assistance is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). *Strickland* established a two-pronged standard for judging, under the Sixth Amendment, the effectiveness of an attorney's  representation at trial:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two

components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687.[4]  The two parts are conjunctive, and a petitioner bears the burden of proving ***both*** "deficient performance" ***and*** "prejudice" by "a preponderance of competent evidence."  *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000)(*en banc*).  "Unless he establishes both requirements, 'it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.'"  *Wilson v. Warden, Georgia Diagnostic Prison*, 898 F.3d 1314, 1322 (11th Cir. 2018)(quoting *Strickland*, 466 U.S. at 687).  However, this court need not address both components;   "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Id*. (quoting *Strickland*, 466 U.S. at 697).  Stated another way, "[b]ecause both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant

---

[4]*See also Williams v. Taylor*, 529 U.S. 362, 390 (2000); *Grayson v. Thompson*, 257 F.3d 1194, 1215 (11th Cir. 2001).

cannot meet the prejudice prong, or vice versa." *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000).

### a. The Performance Prong

"The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007)(citing *Chandler*, 218 F.3d at 1313). To satisfy the performance prong, a petitioner must prove that counsel made errors so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The standard for gauging attorney performance is "reasonableness under prevailing professional norms." *Id*. at 688.[5] "The test of reasonableness is not whether counsel could have done something more or different," but whether counsel's performance "fell within the broad range of reasonable assistance at trial." *Stewart*, 476 F.3d at 1209 (citing *Chandler*, 218 F.3d at 1313). "Furthermore, [the court] must recognize that omissions are inevitable. But, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled." *Id*. (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987))(internal quotations omitted). The Sixth

---

[5] *See also Williams v. Taylor*, 529 U.S. at 390-91; *Darden v. Wainwright*, 477 U.S. 168, 184 (1986); *Chandler*, 218 F.3d at 1313.

17

Amendment does not guarantee a defendant the very best counsel or the most skilled attorney, but only counsel that performs within reasonable professional norms. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. [The court] ask[s] only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

The reasonableness of counsel's performance is judged from the perspective of the attorney at the time of the alleged error and in light of all the circumstances.[6] And, "[u]nder this standard, there are no 'absolute rules' dictating what reasonable performance is or what line of defense must be asserted. . . . Indeed, . . . [a]bsolute rules would interfere with counsel's independence — which is also constitutionally protected — and would restrict the wide latitude counsel have in making tactical decisions." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005)(citations and quotations omitted). Put simply, "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland*, 466 U.S. at 689, and courts must recognize that "trial advocacy is not a science, but an art; there are few 'right' answers in the proper

---

[6]*See, e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001)(giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998)(noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors").

way to handle a trial," *Harvey v. Warden, Union Corr. Inst.*, 629 F.3d 1228, 1238

(11th Cir. 2011)(quoting *Strickland*, 466 U.S. at 693 ("Representation is an art, and

an act or omission that is unprofessional in one case may be sound or even brilliant

in another.")).   Therefore, this court "must indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance."

*Strickland*, 466 U.S. at 689.  After all,

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id*. (citations and internal quotation marks omitted).

"Based on this strong presumption of competent assistance, the petitioner's

burden of persuasion is a heavy one: 'petitioner must establish that no competent

counsel would have taken the action that his counsel did take.'"  *Stewart*, 476 F.3d

at 1209 (quoting *Chandler*, 218 F.3d at 1315). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that *no reasonable lawyer*, in the circumstances, would have done so." *Rogers*, 13 F.3d at 386 (emphasis added).

### b. The Prejudice Prong

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318, 1322 (11th Cir. 2002). "It is not enough for the [habeas petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693; *see also Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). Instead, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In the context of the death sentence itself, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695).

To satisfy this high standard, a petitioner must present competent evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'" *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001)(quoting *Strickland*, 466 U.S. at 687). In other words, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (quotations and citations omitted).

### c. Deference Accorded State Court's Decisions

Deference to a state court resolution of a claim of ineffective assistance involves a double layer of reasonableness. Under the AEDPA, the federal habeas court may grant relief on such a claim only if the state court determination involved an "unreasonable application" of *Strickland* to the facts of the case. *Strickland*, of course, requires an assessment of whether counsel's conduct was professionally unreasonable or did not result in actual prejudice. These two assessments cannot be conflated into one. *See Harrington*, 562 U.S. at 101-02. Thus, habeas relief on a claim of ineffective assistance of counsel can be granted with respect to a claim decided on the merits by the state court only if the habeas court determines that it was "objectively unreasonable" for the state court to find that counsel's conduct was not

"professionally unreasonable" or did not result in actual prejudice. The *Harrington*

Court explained,

> "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. [356], [371], 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; see also *Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S. Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*], 556 U.S.[111, 123], 129 S. Ct. [1411], 1420 [(2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at [123], 129 S. Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question

is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. *See also Premo v. Moore*, 562 U.S. 115, 123 (2011).

When the state court has adjudicated a petitioner's ineffectiveness claims on the merits, the findings of historical facts made in the course of evaluating that claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)(2) and (e)(1). *See Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001). To overcome the state court's finding of fact, the petitioner must show that those findings were unreasonable in light of the evidence before it and carry his burden of proving the facts by clear and convincing evidence.

With these principles in mind, the court turns to Broadnax's claims based on alleged ineffective assistance of counsel.

## 2. Alleged Failure to Investigate Broadnax's Alibi (Claim A)

Broadnax alleges that his trial counsel failed to properly search for alibi evidence because, if they had, they would have discovered that he was at the work release center [WRC] in Alexander City, Alabama, at the time the State claimed he was returning from Birmingham. *See* doc. 1 at 40-59. Consistent with his claim before this court, Broadnax argued to the ACCA that trial counsel "were ineffective for not adequately investigating and presenting at the guilt phase of the trial an alibi

defense that he was at the [WRC] at 9:00 p.m. on the night of the murders" – "a time which would have made it impossible for him to have committed the murders and dumped the bodies in Birmingham, a one and one-half hour drive from Alexander City, between 8:20 p.m. and 8:55 p.m., as the State's evidence at trial indicated." *Broadnax,* 130 So. 3d at 1249 (internal quotations omitted). The ACCA rejected this claim, noting that:

> This claim is based on an alibi defense that directly contradicts the alibi defense presented at Broadnax's trial. In his statements to police, in his statements to his trial attorneys . . ., and at trial, Broadnax claimed that he was at Welborn, not at the [WRC], until about 10:45 p.m. the night of the murders. Indeed, from all that appears, Broadnax continued claiming to have been at Welborn that night for many years after his convictions and sentence. Even in both his original petition, filed in 2003, and his first amended petition, filed in 2004, Broadnax continued in his assertion that he was at Welborn the night of the murders. It was not until 2008, 12 years after the crime, and after this Court had reversed the judgment denying his first amended petition and Broadnax had obtained new Rule 32 counsel to represent him, that Broadnax suddenly changed his story regarding his whereabouts the night of the murders and asserted that he was not at Welborn, as he had alleged for 12 years, but was at the [WRC] at 9:00 p.m. the night of the murders. Although we review this claim under the same principles of law as any other ineffective-assistance-of-counsel claim, we do so with caution, keeping in mind that it is based entirely on a newfound defense.

*Id.*

Broadnax contends that his "lack of clarity about facts relevant to establishing his alibi is unsurprising because we know now, based on Dr. Ken Benedict's expert

24

mental health evaluation, that he is cognitively impaired." Doc. 1 at 48 n.127. He argues, "Dr. Benedict concluded, based on testing, that Mr. Broadnax has either learning disabilities or acquired traumatic brain damage (possibly both), which he characterized as 'serious neuropsychological deficits.'" *Id.* But, Dr. Benedict's diagnoses and opinion do not explain why Broadnax would provide inconsistent statements that he was at Welborn until 10:45p.m. on the night of the murders when he purportedly was actually at the WRC at 9:00 p.m. In addition to evidence at trial showing that Broadnax told Det. Cunningham and his counsel that he was at Welborn at 9:00 p.m. on the night of the murders, *see Broadnax*, 130 So. 3d at 1253, 1257, Mark Chastain testified he saw Broadnax at Welborn between 10:30 and 10:45 p.m., *see Broadnax*, 825 So. 2d at 150, and Kathy Chastain testified that she saw someone matching Broadnax's description during the same time period, *id.* In other words, the weight of the evidence belies Broadnax's new contentions about his whereabouts. More importantly, Dr. Benedict diagnosed Broadnax with "a cognitive disorder, not otherwise specified, a receptive-expressive language disorder, a reading disorder, and a disorder of written expression;" he also testified that Broadnax "met only part of the criteria for a learning disorder and a cognitive disorder." *Broadnax*, 130 So. 3d at 1267 (internal quotations and citations omitted). Critically, Dr. Benedict never stated

that Broadnax cannot accurately remember actual events,[7] nor did he testify or offer any evidence that, because of his mental condition, Broadnax could not give an accurate account of his whereabouts on the night of the murders.

Relevant to the court's inquiry, although Broadnax presented evidence at the 2011 Rule 32 hearing that he was at the WRC by 9:00 p.m. on the night of murders, he did not present any evidence that his trial attorneys had this information or that they had any reason to suspect that he was at the WRC, rather than at Welborn as he had told them and as witnesses at trial had confirmed. In rejecting Broadnax's contention, the ACCA held that Broadnax is essentially attacking his lawyers for information he never provided them, and that consequently counsel did not perform deficiently.[8] And, the court also rejected the claim because Broadnax never

---

[7]Dr. Benedict did opine that Broadnax had "language processing problems in the form of receptive and expressive language dysfunction . . . , which also has a deleterious impact on *auditory* working memory," but that Broadnax's "scores on the Visual Memory Test are well within the average range, if not above average." Doc. 12, Vol. 36 at 948, 949.

[8]In finding that trial counsel's failure to investigate was not deficient performance under *Strickland,* the ACCA stated in pertinent part:

Broadnax now argues, essentially, that his trial counsel should have investigated and presented evidence to the jury that Broadnax had lied to the police [another] time – when he had said that he was at Welborn until 10:45 p.m. the night of the murders. "[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether." *Strickland,* 466 U.S. at 691, 104 S. Ct. 2052. An attorney's decision regarding investigation depends "critically" on information received from his or her client. *Id.* at 691, 104 S. Ct. 2052. In this case, neither [of Broadnax's attorneys] had any reason whatsoever to

questioned his lawyers about their reasons for not investigating this purported alibi.[9]

*Broadnax*, 130 So. 3d at 1256 and n.21.

---

think that an investigation into the possibility that Broadnax was somewhere other than Welborn at 9:00 p.m. the night of the murders was necessary. Broadnax told the police, and both Brower and Bender, that he was at Welborn at 9:00 p.m. the night of the murders, not at the [WRC]. "Trial counsel's performance cannot be deemed ineffective for failing to locate alibi witnesses whose existence was not brought to his attention." *Adkins v. State,* 280 Ga. 761, 762, 632 S.E.2d 650, 653 (2006). *See also Davis v. State,* 9 So. 3d 539 (Ala. Crim. App. 2008).

More importantly, even if counsel had some basis for possibly thinking that Broadnax had lied to them and to the police and may have, in fact, been at the [WRC] at 9:00 p.m., given that it was clear that Broadnax had lied to the police regarding other things, we cannot say that any decision to forgo attempting to further impugn their client's credibility by presenting additional evidence of Broadnax's lying to the police was unreasonable. *See, e.g.*, *Traylor v. State,* 466 So. 2d 185, 189 (Ala. Crim. App. 1985)(Rule 32 petitioner's claim that counsel was ineffective for not calling to testify a witness who could have provided an alibi was meritless where alibi witness's testimony would have contradicted petitioner's own testimony at trial). Therefore, the circuit court correctly found that Broadnax failed to prove that his counsel's performance in this regard was deficient.

*Broadnax*, 130 So. 3d at 1256-58 (ACCA footnote omitted).

[9]The court stated:
In this case, neither [of Broadnax's attorneys] was ever questioned about whether he had investigated the possibility of an alibi defense based on Broadnax's being at the [WRC] at 9:00 p.m. the night of the murders, much less about why he did not pursue that defense, as opposed to the alibi defense that counsel did pursue, i.e., that Broadnax was at Welborn at 9:00 p.m. the night of the murders. Because the record is ambiguous as to the basis of [Broadnax's attorneys'] decision in this regard, we must presume that they exercised reasonable professional judgment. See *Whitson v. State,* 109 So. 3d 665 (Ala. Crim. App. 2012)(Rule 32 petitioner failed to prove that appellate counsel was ineffective where, although petitioner called appellate counsel to testify at hearing, petitioner did not question appellate counsel about the ineffective-assistance claims raised in the petition). Thus, the circuit court correctly found that Broadnax, by failing to question his attorneys about this specific claim, failed to overcome the presumption that counsel acted reasonably.

To succeed on his claim, Broadnax must show that no reasonable lawyer, in light of information "already in hand" at the time of trial, *see Strickland*, 466 U.S. at 699, would have neglected to investigate whether Broadnax was at the WRC on the night of the murders. *See Wiggins v. Smith*, 539 U.S. 510, 527 (2003)("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."). Broadnax has failed to make this showing. In particular, Broadnax has not shown that counsel knew or had reason to suspect that Broadnax was at the WRC at the time of the murders.

"[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). Therefore, "[i]n assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S. at 527. This "known evidence" includes defendant's statements and actions, and, indeed, "[t]he reasonableness of counsel's actions may be determined or substantially

influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at

691. As *Strickland* notes:

> Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Id.*

Here, Broadnax relies on new evidence that was not available to his lawyers – i.e. that he was at the WRC on the night of the murders. But this new evidence "merely conflates the existence of a contrary picture of [his whereabouts on the night of the murders] developed ex post on collateral review with [trial counsel's] therefore-inadequate ex ante actions." *Tharpe v. Warden*, 834 F.3d 1323, 1342 (11th Cir. 2016). In other words, the fact that Broadnax, years after his trial, was able to present evidence that he was at the WRC at 9:00 p.m. on the night of the murders, and not at Welborn as he had maintained consistently until his second amended Rule 32

petition, does not answer the question of what trial counsel knew, or should have known, at the time of the trial that made their decision not to investigate further his whereabouts unreasonable.

A review of the record shows that Broadnax told trial counsel, as well as Det. Cunningham, that he was at Welborn on the night of the murders – when his murdered wife brought him dinner, when she left at 8:20 p.m., and when he called his brother at 9:00 p.m. *Broadnax*, 130 So. 3d at 1257. Moreover, Johnny Baker testified he saw Broadnax driving away from Welborn, Kathy Chastain testified she saw an individual matching Broadnax's description run into Welborn at 10:30 p.m., and Mark Chastain testified that he found Broadnax inside Welborn at 10:45 p.m. And, Broadnax has not cited any record evidence that would overcome the ACCA's finding that he told counsel and Det. Cunningham that he was at Wellborn at 8:20 p.m. and 9:00 p.m. on the night of the murders. Nor has the court found anything in the record to support a finding that trial counsel knew, or had any reason to suspect, that Broadnax was instead at WRC at 9:00 p.m. or that further investigation would have likely led to evidence supporting a valid alibi. And, as noted by the ACCA, Broadnax did not question his trial counsel about their investigation of his alibi after he asserted, in his second amended Rule 32 petition, that he was at the WRC at 9:00

p.m. on the night of the murders. In short, there is nothing in the record to show that trial counsel had notice of the alleged alibi or had reason to suspect its existence.

Based on this record, "trial counsel cannot reasonably be faulted for failing to discover information which was within [Broadnax's] personal knowledge . . . but which [he] failed to disclose to his trial counsel." *Dallas v. Dunn*, No. 2:02-CV-777-WKW, 2017 WL 3015690, at \*65 (M.D. Ala. July 14, 2017). Moreover, counsel's performance was not deficient because they failed to investigate Broadnax's whereabouts at 9:00 p.m. on the night of the murders on the "off-chance" they would find that he was in fact not at Welborn as he had represented to counsel. Indeed, prior to the second amended Rule 32 petition, the record contains nothing that suggests or hints that Broadnax returned to the WRC at 9:00 p.m. Accordingly, Broadnax has not proven that the ACCA's decision regarding counsel's investigation of his alibi defense was based on an unreasonable determination of the facts in light of the evidence presented or was contrary to or an unreasonable application of *Strickland*. This court finds that most, if not all, fairminded jurists would agree with the ACCA's decision, and therefore does not reach the court's decision that Broadnax was not prejudiced by his trial counsel's deficient investigation of his alibi, and whether this was an unreasonable application of clearly established federal law or an unreasonable factual determination. *See Holladay*, 209 F.3d at 1248.

### 3. Alleged Failure to Obtain a Psychological Evaluation for Use During the Penalty Phase (Claim B)

Broadnax alleges also that the ACCA's decision, that trial counsel were not ineffective for "failing to obtain a psychological evaluation of him to use at the mitigation phase of his trial," is an unreasonable application of *Strickland* and an unreasonable determination of the facts.  Doc. 1 at 59-60.  He argues, "[t]he [ACCA's] conclusion that mental health evidence would not have altered the balance of aggravating and mitigating evidence is legally unsupportable because it implies that no amount of mitigation would have led a jury to spare Mr. Broadnax's life," and "[f]undamental to the Supreme Court's death penalty jurisprudence is the notion that there is no defendant and no crime for which a death sentence can be automatic." *Id*. at 68 (citing *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976))(footnote omitted).

The ACCA denied this claim, agreeing with the trial court that counsel's performance was not deficient. *See Broadnax*, 130 So. 2d at 1266-68. It also found that, even considering the results of post-conviction psychological testing, counsel's failure to have Broadnax evaluated did not result in prejudice because the aggravating circumstances clearly outweighed any and all mitigating circumstances offered at trial and in the Rule 32 proceedings.  *Id*. at 1267.  As explained below, the state court's

decision, which is based on a reasonable interpretation of the facts, is neither contrary to nor an unreasonable application of Supreme Court precedent.

### a. The Performance Prong

To support his claim that trial counsel performed deficiently, Broadnax contends that counsel made the decision to forego a psychological evaluation without conducting a reasonable investigation into his background. Allegedly, counsels' "decision to forego a psychological defense . . . cannot be justified by counsels' personal observations of Mr. Broadnax," based on the post-conviction findings of Dr. Benedict. Doc. 1 at 62-63. He argues:

> The [ACCA] found that counsel were reasonable in failing to get a mental health examination because "counsel indicated that Broadnax was intelligent, well-spoken, and very cooperative." In fact, one of his attorneys described him as a "bright guy." These observations from untrained lay persons are ludicrous in light of the facts adduced by a thorough evaluation from a trained psychologist. Neither of these conclusions is reasonable based on the evidence that was before the state court.

*Id*. at 60 (footnotes omitted). As Broadnax puts it, a reasonable investigation into his background would have found that he was abused as a child, sexually assaulted by a neighbor, suffered brain damage from a closed-head injury, and had attempted suicide – facts which would have signaled the need for a psychological evaluation. *See id*. at 60-61; doc. 19 at 29-30.

In determining that trial counsel's performance was not deficient, the ACCA found:

> [A]t the 2005 [Rule 32] hearing, both Brower and Bender testified. With respect to mitigation, Brower said that he spoke with Broadnax as well as several members of Broadnax's family, although he could not remember exactly whom he had spoken to, and that he had also personally "met with a number of family members" regarding mitigation. ([Doc. 12, Vol. 26 at] R. 111.) According to Brower, Broadnax provided no names of people who could possibly offer mitigation evidence, other than family members, and he received more information regarding Broadnax's history from Broadnax's eldest sister, Dorothy McKinstry, than from Broadnax himself. Brower stated that there was "not a lot of mitigation evidence present." ([*Id*. at] R. 142.)
>
> Brower testified that he did not seek a psychological evaluation of Broadnax because he did not believe, based on his interactions with Broadnax, that such an evaluation was necessary. Specifically, Brower said that "Mr. Broadnax did not strike me as being someone who needed a psychological evaluation at the time. And it's always been my practice not to file motions such as a psychological evaluation unless I can support them with some articulable reason." ([*Id*. at] R. 109.) Brower said that he had no reason to believe that a psychological evaluation would have been helpful, especially given that he truly believed that Broadnax was innocent. Brower also said that, even after the jury returned a guilty verdict after the guilt phase of the trial (which, he said, was a shock to him) he "still didn't think that a psychological evaluation of Mr. Broadnax was warranted." ([*Id*. at] R. 113.)
>
> Bender testified that he did "quite a bit" of mitigation investigation, but could find little mitigating evidence. ([*Id*., Vol. 25 at] R. 38.) As a result, only Broadnax's sister, Dorothy [McKinstry], was called to testify as a mitigation witness. Bender stated that he prepared Dorothy for her testimony and that he and Brower "discussed her testimony with her before she went on the . . . stand in the mitigation phase." ([*Id*., Vol. 26 at] R. 135.)

Bender said that he went to Welborn and personally spoke "to those individuals down there," but that all he discovered was that Broadnax was "just the average guy working in their facility" and that there was "nothing different or special about him." ([*Id*. at] R. 67.) Bender also testified that he spoke with Broadnax's family members, including Broadnax's two sisters, brother-in-law, and mother, "quite often" about mitigation. ([*Id*., Vol. 25 at] R. 39.) Bender also personally went to Elyton Village, where Broadnax had grown up, and spoke with as many people as he could as part of the mitigation investigation, but the people there simply "couldn't remember" [Broadnax] because [he] had been in prison, and away from Elyton Village, for almost 20 years. ([*Id*. at] R. 40.) Indeed, Bender said that the only person he found who actually remembered Broadnax from Elyton Village was Vince Cunningham, the Birmingham police detective who investigated the murders of Jan and DeAngelo and who testified for the State at Broadnax's trial.

Bender also testified that he explained to Broadnax the purpose of mitigation, explained the type of evidence that could be presented as mitigation, and gave Broadnax "ideas about what I was looking for as far as mitigation." ([*Id*. at] R. 33.) Indeed, he said "that's what most of those visits were about." ([*Id*., Vol. 26 at] R. 91.) Bender said that Broadnax clearly understood the concept of mitigation because "[h]e's a bright guy," but was unable to provide Bender with any possible mitigating evidence. ([*Id*.]) In fact, Bender said that even though Broadnax's "parents [sic] and family told me that he was abused as a child," Broadnax denied any such abuse, claiming that he had gotten into trouble a lot and "was just sort of a tough kid," so the family "had to sort of be tough on him."[10] ([*Id*. at] R. 92.) In addition, according to Bender, Broadnax's family said that when he was growing up Broadax was "normal for the area" and that only after his father died did Broadnax "sort of g[et] out of control" by getting involved in criminal activity and eventually committing murder and going to prison. ([*Id*., Vol. 25 at] R. 36.) Bender said that he spoke with both Broadnax and his family members about this time in Broadnax's life, before he went to

---

[10]Despite being present at the hearing, Broadnax did not testify that he was abused or deny that he had told Bender he was not abused.

prison, and even specifically asked Broadnax's mother about any "health issues that he may have had[,]" (*[Id.,](Id.)* Vol. 26 at] R. 50)[,] but that neither "[h]e nor his family members ever told me anything about any kind of medical history that he's had, any issues with drugs. They never told me about him being hit by a car . . . . [T]his [the 2005 Rule 32 hearing] is the first I'm hearing it." (*[Id.,](Id.)* Vol. 25 at] R. 36.) Bender also testified that a suicide attempt in Broadnax's past would "certainly" have resulted in his seeking a psychological evaluation of Broadnax, but that neither Broadnax nor any member of his family told Bender that Broadnax had attempted suicide. (*[Id.,](Id.)* Vol. 26 at] R. 49.) Indeed, Bender said that, despite speaking with Dorothy McKinstry numerous times by telephone, Dorothy did not even mention to him before trial that Broadnax had lived with her for a year; Dorothy said only that Broadnax had visited her in the summers and on special occasions.

When questioned about the decision not to seek a psychological evaluation of Broadnax, Bender explained:

> "My basis, and Mr. Brower and I discussed this, was this: Obviously, once you meet your client, you have a chance to talk to him[,] . . . see them on an occasion or two. And if there are things about the person's demeanor, if there are things about the person's conversation, if there are things about the persons's behavior that would suggest to you that they're not stable, then obviously you want to have them evaluated. It was just the opposite with Mr. Broadnax.

> . . . .

> "Mr. Broadnax was, in my opinion, in having dealt with, up to that point, having dealt with a lot of people who were in prison and who had committed crimes, he was a bright person. He was very fluent in his conversation. He was eloquent to a degree. He had – his handwriting was magnificent. He explained – those things that he explained to [me], he explained them to me in . . . a good sort of common sense. He had ideas. As I explained the facts to him as we knew them, he had ideas to sort of explain why

these things couldn't be, why this couldn't be this way. And so there was absolutely nothing about him, his demeanor, his conversation, his behavior, his hygiene [–] You know, hygiene is one of those things you can normally look at and tell whether a person has mental or emotional issues [–] [h]e had none of those things. So there was no reason, in my opinion, to have him evaluated. The fact that he was charged with this really horrendous crime is not a basis just to have him evaluated, especially when he tells you he didn't have anything to do with it. And to be honest with you, I believed him."

([*Id.*, Vol. 25 at] R. 29-31.) Bender also described Broadnax as "[w]ell spoken" and "mild mannered" and said that Broadnax "could write" and that he "conversed well." ([*Id.*, Vol. 26 at] R. 97.) He further said that Broadnax was very cooperative, "as cooperative as any individual I probably ever represented before that and even since that." ([*Id.*, Vol. 25 at] R. 32.) He also said that Broadnax was clearly capable both mentally and emotionally to assist in his defense.

*Broadnax*, 130 So. 3d at 1261-64 (footnote added).

Broadnax did not question his attorneys about Dr. Benedict's findings or about his mental impairments or learning disabilities. His trial counsel were questioned however about their efforts to obtain Broadnax's school records. And, records for three schools years (6th through 8th grades) obtained by Rule 32 counsel were admitted at the 2005 hearing. Doc. 12, Vol. 25 at 951; *id.*, Vol. 26 at 44-48. The school records however do not reflect the level of impairment described by Dr. Benedict.[11]

––––––––––––––––––––

[11]Broadnax's letter grades by subject for each school year were: (1) sixth grade – an A in physical education; a B in art; C's in library, music, and science; and D's in English, math, and social

37

In addition to addressing the testimony of trial counsel at the 2005 hearing, the ACCA noted that Broadnax's family – "his two sisters Dorothy McKinstry and Annette McKinstry, his two nephews LaQuintas McKinstry and Joseph DeAngelo McKinstry, and his niece Chiquita Swift" – testified at the hearing, and that their testimony "did not support, but refuted, several of Broadnax's allegations about his childhood." *Broadnax,* 130 So. 3d at 1245. The ACCA found:

> For example, in his original petition, Broadnax alleged that, when he lived with his older sister, Dorothy McKinstry, in Michigan for a year when he was a teenager, his sister and brother-in-law physically abused him and starved him. He also alleged in his second amended petition that while living in Michigan he attempted to commit suicide. However, at the 2005 hearing, Dorothy testified that neither she nor her husband physically abused Broadnax and that he was well fed while he lived with them. She also said that Broadnax's alleged suicide attempt was not, in fact, a suicide attempt, but was an accidental overdose from a mixture of alcohol and pain medication Broadnax had stolen from her. Broadnax also alleged in his original petition and second amended petition that he was physically abused by his mother. However, at the 2005 hearing, Broadnax's younger sister, Annette McKinstry, testified that, although Broadnax was punished with "whippings" with a switch or a belt whenever he got into trouble, he was not punished excessively. ([Doc. 12, Vol. 26 at] R. 149.)

*Id.* at 1261 n.24.

---

studies; (2) seventh grade – an A in art; B's in library, science, and writing; C's in language, literature, math, music, physical education, and speech arts; and D's in social studies and spelling; and (3) eighth grade – a year when Broadnax missed 26 days of schools – an A in art; a B+ in physical education; a B in writing; a C+ in library; C's in literature, science, and social studies; and D's in math and spelling. Doc. 12, Vol. 25 at 951.

In reviewing the performance of trial counsel, this court's "test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. [The court] ask[s] only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992). Generally, in a death penalty case, trial counsel has an obligation to thoroughly investigate defendant's background for possible mitigation evidence. *See Wiggins*, 539 U.S. at 522. But, while "[c]ounsel representing a capital defendant must conduct an adequate background investigation, . . . it need not be exhaustive." *Raulerson v. Warden*, 928 F.3d 987, 997 (11th Cir. 2019)(citation omitted).

"In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. "'[W]hat investigation decisions are reasonable depends critically' upon the information the defendant furnishes to his counsel," *Pooler v. Secretary, Florida Dept. of Corrections*, 702 F.3d 1252, 1269 (quoting *Strickland*, 466 U.S. at 691), and

information family members furnish to counsel, *see Stewart*, 476 F.3d at 1211. Of course, as with all issues related to judging the reasonableness of counsel's performance under *Strickland*, "a court must avoid using 'the distorting effects of hindsight' and must evaluate the reasonableness of counsel's performance 'from counsel's perspective at the time.'" *Chandler v. United States*, 218 F.3d 1305, 1316 (11th Cir. 2000)(quoting *Strickland*, 466 U.S. at 689).

Moreover, "counsel is not required to seek an independent [mental] evaluation when the defendant does not display strong evidence of mental problems." *Holladay*, 209 F.3d at 1250 (citing *Bertolotti v. Dugger*, 883 F.2d 1503, 1511 (11th Cir. 1989)). Indeed, in cases where the defendant did not "exhibit[ ] any 'red flags' or 'obvious indicators' of substantial mental health problems, which would have led a reasonable attorney to delve further into possible mental health issues," *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1332 (11th Cir. 2013), or where a defendant did not "have trouble communicating and was generally cooperative" and "never did or said anything to indicate to [counsel] that he had any mental problems," *Baldwin v. Johnson,* 152 F.3d 1304, 1314 (11th Cir. 1998), counsel's failure to request a psychiatric examination was not deficient.

As discussed *supra*, the testimony of trial counsel, when considered in light of Broadnax's family members' testimony at the 2005 Rule 32 hearing, and Dorothy

McKinstry's testimony during the penalty phase of the trial, demonstrates that trial counsel had no indication that a psychological evaluation was warranted or would assist in their presentation of a mitigation case. Broadnax's presentation and demeanor did not indicate the presence of a mental or behavioral disorder. And, although Broadnax faults trial counsel for failing to discover that he was physically abused as a child, sexually abused by a neighbor, suffered a closed-head injury, and had attempted suicide, no evidence in the record establishes that Broadnax or his family members ever gave this information to counsel or that counsel ignored indications or red flags that indicated further investigation was required.[12]

Indeed, Broadnax has not pointed to any facts of record that would support a finding that counsel had notice, much less "strong evidence," of the need to have Broadnax independently evaluated for mental and/or psychological impairments. *See Holladay*, 209 F.3d at 1250. To the contrary, based on the record, after talking with family members and interacting with Broadnax prior to trial, counsel had no reason to suspect the existence of a psychological or mental impairment related to Broadnax's ability to engage in written expression that was later diagnosed by Dr.

---

[12]*See Rompilla*, 545 U.S. at 390 (if counsel had looked in the file of petitioner's prior conviction, which was easily accessible and which the State planned to use to prove aggravating circumstances, "they would have found a range of mitigation leads that no other source had opened up"); *Hardwick v. Sec'y, Fla. Dep't of Corr.*, 803 F.3d 541, 552 (11th Cir. 2015)(court found counsel's performance was deficient because counsel "was aware of a number of red flags," but unreasonably failed to investigate further).

Benedict. And, Broadnax has not identified what "red flags" his trial counsel should have seen that would have led a  reasonable lawyer to have Broadnax evaluated by a mental health professional.

To close, Broadnax's reliance on Dr. Benedict's post-trial evaluation and report has "merely conflate[d] the existence of [the] contrary picture of [his] upbringing [and mental condition] developed ex post on collateral review [by Dr. Benedict] with [trial counsel's] therefore-inadequate ex ante actions." *Tharpe*, 834 F.3d at 1342. Stated differently, that Broadnax presented evidence developed years after trial that he suffered cruelly as a child and that he had cognitive and learning impairments does not answer the question of what trial counsel knew, or should have known, at the time of trial that made their decision not to seek a psychological evaluation unreasonable. Therefore, Broadnax has not "established that no competent counsel would have taken the action that his counsel did take," *Chandler*, 218 F.3d at 1315, and, because, most, if not all, fairminded jurists would agree with the ACCA's decision, habeas relief on this issue is due to be denied.

### b. The Prejudice Prong

In light of the finding related to trial counsel's performance, the court need not decide whether Broadnax suffered any prejudice. However, the court provides the following with regard to the exclusion of Dr. Benedict's hearsay testimony and the

purported prejudice from counsel's failure to obtain an independent psychological evaluation.

> i. Whether the Exclusion of Hearsay Evidence at the Rule 26 Hearing Violated Broadnax's Due Process Rights (**Claim C**)

Broadnax contends that the state court violated his due process rights by excluding hearsay testimony at his Rule 32 hearing, even though that testimony would have been admissible at the penalty phase of his case. Doc. 1 at 75. Under Alabama law, hearsay testimony is not admissible in Rule 32 proceedings. *Davis v. Allen*, No. CV 07-S-518-E, 2016 WL 3014784 at *94-95 (N.D. Ala. May 26, 2016)(citing *Hunt v. State*, 940 So. 2d 1041, 1051 (Ala. Crim. App. 2005)). Consistent with the law, the trial court excluded hearsay testimony Broadnax offered from Dr. Benedict at the 2011 hearing, and Broadnax contends this ruling violated his due process rights.

"The standard of review for state evidentiary rulings in federal habeas corpus proceedings is a narrow one. Only when evidentiary errors 'so infused the trial with unfairness as to deny due process of law' is habeas relief warranted." *Felker v. Turpin*, 83 F.3d 1303, 1311-12 (11th Cir. 1996)(quoting *Lisenba v. California*, 314 U.S. 219, 228 (1941), *quoted and applied in Estelle v. McGuire*, 502 U.S. 62, 75 (1991); and citing *Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir. 1995); *Kight v.*

*Singletary*, 50 F.3d 1539, 1546 (11th Cir. 1995)).  Therefore, "a federal court reviewing a state prisoner's habeas petition may not 'reexamine state-court determinations on state-law questions,' but it may review state evidentiary rulings to determine whether the rulings violated the petitioner's due process rights." *Smith v. Jarriel*, 429 F. App'x. 936, 937 (11th Cir. 2011) (quoting *Estelle*, 502 U.S. at 67-68; other citations omitted).

Based on the court's review of the record, the exclusion of Dr. Benedict's testimony as hearsay did not violate Broadnax's due process rights.  As the ACCA pointed out, Broadnax could have presented the substance of these hearsay statements through the testimony of Broadnax and the relevant family members.  However, despite being present at the evidentiary hearing, Broadnax did not testify as to the events described in Dr. Benedict's proffer, and he did not call any family members to testify to the events that were the subject of statements to Dr. Benedict.  Because Broadnax was not denied the opportunity to present these facts in an admissible form at the evidentiary hearing, he cannot show that the failure to allow Dr. Benedict to offer this testimony denied him a fundamentally fair proceeding.  Simply arguing that hearsay statements are admissible in the penalty phase proceedings is insufficient to establish that exclusion of hearsay testimony made the Rule 32 proceeding so

fundamentally unfair that it violated his right to due process. Therefore, Broadnax's

claim on this issue is due to be denied.[13]

>        ii.     Whether Counsel's Failure to Obtain a Psychological
>                Evaluation Prejudiced Broadnax

"Under *Strickland*, a defendant is prejudiced by his counsel's deficient

performance if 'there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different.'" *Porter v. McCollum*,

558 U.S. 30, 40 (2009)(quoting *Strickland*, 466 U.S. at 694). "[W]hen defense

counsel's alleged deficiency occurred at the penalty phase of a capital trial, a habeas

petitioner needs to show that, 'but for his counsel's deficiency, there is a reasonable

probability he would have received a different sentence.'" *Waldrop v. Comm'r,*

*Alabama Dep't of Corr.*, 711 F. App'x 900, 910 (11th Cir. 2017)(quoting *Porter*, 558

U.S. at 41).   "A reasonable probability is a probability sufficient to undermine

confidence in the outcome." *Strickland*, 466 U.S. at 694. Again, to assess this

"reasonable probability," the court must "evaluate the totality of the available

---

[13]In evaluating the reasonableness of the State court's prejudice determination, the federal habeas court "evaluate[s] the totality of the available mitigation evidence – both that adduced at trial and the evidence adduced in the habeas proceeding – in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98 (citing *Clemons v. Mississippi*, 494 U.S. 738, 751-52 (1990)); *see also Jones v. GDCP Warden*, 753 F.3d 1171, 1185 (11th Cir. 2014). This "available mitigating evidence" includes Dr. Benedict's offer of proof. Therefore, if Broadnax had shown deficient performance, this court would have considered Dr. Benedict's proffered hearsay testimony as available mitigating evidence and weighed that evidence against the aggravating evidence.

mitigation evidence – both that adduced at trial, and the evidence adduced in the

habeas proceeding – in reweighing it against the evidence in aggravation." *Williams*,

529 U.S. at 397-98 (citing *Clemons*, 494 U.S. at 751-52).   The petitioner has the

burden of showing "that the evidence on the prejudice question is so one-sided in his

favor that the [ACCA's determination that he was not prejudiced by counsel's failure

to have him psychologically evaluated] is, as the Supreme Court has phrased it,

'beyond any possibility for fairminded disagreement.'" *Holsey v. Warden, Georgia*

*Diagnostic Prison*, 694 F.3d 1230, 1258 (11th Cir. 2012)(quoting *Harrington*, 562

U.S. at 103).

With regard to the question of prejudice, the Rule 32 court held:

> To support his claim that he was prejudiced by the absence of
> psychological testimony, Broadnax offered the testimony of Dr. Kenneth
> Benedict, a psychologist . . . Dr. Benedict testified regarding a number
> of tests he administered to Broadnax, including an 'I.Q.' test that
> showed Broadnax to be in the average to low average intelligence range.
> Dr. Benedict opined that Broadnax suffered from . . . Cognitive Disorder
> Not Otherwise Specified, Expressive Language Disorder, Reading
> Disorder, and Disorder of Written Expression.
>
> The State offered evidence of four aggravating circumstances at the
> penalty phase and the jury . . . unanimously recommended the death
> penalty. There is no reasonable probability that testimony that Broadnax
> suffers from "Cognitive Disorder Not Otherwise Specified" and
> language disorders would have led to a different result in this case.
> Similarly, the Court finds that the test results testified to by Dr. Benedict
> do not give rise to a reasonable probability that the result of his trial
> would have been different had trial counsel presented them.  . . .

*Broadnax*, 130 So. 3d at 1265 (quoting doc. 12, Vol. 32, Tab 76 at 79-80)(internal

quotations omitted).  The Rule 32 court also noted:

> Prior to the evidentiary hearing, the State filed a motion in limine
> seeking to exclude the presentation of hearsay evidence through Dr.
> Benedict.  The Court granted the State's motion, but allowed Broadnax
> to make a proffer regarding the testimony he expected from Dr.
> Benedict.  The proffer included statements made to Dr. Benedict by
> Broadnax and his family regarding Broadnax's childhood and Dr.
> Benedict's opinions based on those statements.  For instance, Broadnax
> told Dr. Benedict that he [was] sexually assaulted by a neighbor when
> he was an adolescent.  Based on this statement Dr. Benedict was
> expected to opine that Broadnax suffered from post traumatic distress
> syndrome and other mental problems.  Though the evidence described
> in Broadnax's proffer was not before the Court, the Court has
> considered it for the purposes of an alternative finding.  Broadnax was
> thirty-five when he murdered the victims in this case.  The court finds
> that it is not reasonably probable that a diagnosis of PTSD based on an
> event that occurred more than twenty years earlier would have had any
> impact on the jury's decision.  As such, the Court finds that even
> considering the proffered evidence, Broadnax failed to demonstrate
> prejudice.

Doc. 12, Vol. 32, Tab 76 at 81-82.

The ACCA did not address this alternative prejudice decision by the circuit

court.  *Broadnax*, 130 So. 3d at 165 n.25.  However, it did agree with the circuit

court's prejudice finding, stating that after "thoroughly review[ing] the record from

Broadnax's direct appeal, . . . we agree with the circuit court that even if evidence had

been presented to the jury that Broadnax had a cognitive disorder, not otherwise

specified, a receptive-expressive language disorder, a reading disorder, and a disorder

of written expression, such evidence would not have altered the balance of aggravating and mitigating circumstances in this case." *Broadnax*, 130 So. 3d at 1267-68. Consequently, the court found "the circuit court also correctly found that Broadnax failed to prove that he was prejudiced by his counsel's decision not to have him evaluated." *Id*.

This court has reviewed, de novo, "(1) evidence from the original guilt-innocence phase, (2) evidence from the original penalty phase, [and] (3) evidence the petitioner presented to the state habeas court," including Dr. Benedict's hearsay evidence. *See Whatley*, 927 F.3d at 1176. Based on its review, the court finds no substantial likelihood that Broadnax would have received a different sentence if the decisionmakers had heard Dr. Benedict's complete opinion.

To begin, as the ACCA found:

> The jury's verdicts from the guilt phase of Broadnax's trial established beyond a reasonable doubt the aggravating circumstances that the capital offense was committed during a kidnapping and that Broadnax had committed the capital offense after having been convicted of a felony involving the use . . . of violence, i.e., murder.[14] See *Coral v. State*, 628 So. 2d [954,] 965-66 [(Ala. Crim. App. 1982)].

> Additionally, the evidence presented during the guilt phase of trial was uncontroverted that Broadnax was serving a sentence of imprisonment

---

[14]At the 2005 Rule 32 evidentiary hearing, the State offered details about the 1978 murder, including that, after the victim had turned to leave, Broadnax shot at him six times and then reloaded and fired three more shots. Doc. 12, Vol. 26 at 214.

at the time of the offenses. The state also argued that the killings of Jan and DeAngelo were "especially heinous, atrocious, and cruel"[15] because of the "nature of the killings" and because of the extensive mental anguish suffered by DeAngelo before his death. The state emphasized the testimony during the guilt phase of Dr. Brissie that Jan's and DeAngelo's wounds indicated that they were lying on the ground defenseless when they were stabbed. The state reiterated Dr. Brissie's testimony that Jan received at least 13 head wounds and that DeAngelo's skull was brutally crushed. The state further argued that because the evidence indicated that DeAngelo saw his grandmother, Jan, being beaten and then had to ride in terror for approximately one and a half hours before Broadnax decided to kill him, DeAngelo's murder was especially [HAC] as compared to other capital offenses.

*Broadnax*, 825 So. 2d at 214-15 (footnote added).[16]

---

[15]Heinous, atrocious, and cruel are hereafter referred to as HAC.

[16]In her concurrence, Judge Cobb wrote:

The evidence indicates that Broadnax viciously beat his wife, Jan, to death with his fists and with wooden sticks in the presence of her four-year-old grandson. The evidence indicates that Broadnax then stuffed his wife's body into the trunk of her automobile and drove the automobile from his prison work-release workplace, with her grandson in the car with him. After taking the four-year-old from the scene of his first murder, Broadnax then beat the young child to death with such force that it caused the top of his brain to be ripped and lacerated. . . . It boggles the mind to consider the terror of a small child abducted by a man whom he had just watched brutally beat his grandmother to death, realizing he was about to meet the same grizzly fate.

*Broadnax*, 825 So. 2d at 223 (Cobb, J., concurring specially).

Despite this overwhelming evidence supporting the aggravating circumstances, Broadnax argues that trial counsel erred, in part, by failing to present mitigating evidence regarding psychological problems, including his alleged suicide attempt.[17] But, Broadnax overlooks that overwhelming evidence of aggravating circumstances can indeed outweigh prejudice caused by counsel's failure to present mitigating evidence. This is especially the case where, as here, the alleged psychological trauma is years removed from the murders in question. As the Eleventh Circuit found in a case involving a similar issue:

> The mitigation evidence offered at the Rule 32 hearing primarily concerned physical abuse [petitioner] suffered as a child, yet [petitioner was 35 when he committed the crime. When a defendant is several decades removed from the abuse being offered as mitigation evidence its value is minimal. *See Francis v. Dugger*, 908 F.2d 696, 703 (11th Cir.1990) (according "little, if any, mitigating weight" to evidence of a deprived and abusive childhood where defendant was 31 years old when he committed the murder). . . . Overall, the mitigation evidence offered on [petitioner's] behalf was less than compelling.
>
> On the other hand, the state court found three aggravating factors: the crime was committed while [petitioner] was under sentence of imprisonment; [petitioner] had been previously convicted of a crime of violence; and the murder was committed during a kidnapping. We have previously noted that "[m]any death penalty cases involve murders that are carefully planned, or accompanied by torture, rape or kidnapping."

---

[17]The record shows that trial counsel had no evidence to support this contention regarding a suicide attempt. Dorothy McKinstry, at whose house the alleged suicide attempt occurred, testified that Broadnax did not attempt suicide, and that Broadnax overdosed instead on pain pills and alcohol he took in an effort to get high.

> Dobbs v. Turpin, 142 F.3d 1383, 1390 (11th Cir. 1998) (alteration in original)(quotations omitted). "In these types of cases, this court has found that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer fails to present mitigating evidence." *Id*. While that is obviously not an absolute rule, it demonstrates the burden a defendant faces when trying to overcome such harsh aggravating factors with mitigating evidence. *See Clisby v. Alabama*, 26 F.3d 1054, 1057 (11th Cir.1994) ("[S]ometimes the best lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder – or, even, a less brutal murder for which there is strong evidence of guilt in fact."); *see also Crawford v. Head*, 311 F.3d 1288, 1321 (11th Cir. 2002)(finding no prejudice in part because of the "strength of the evidence both of Crawford's guilt and of the aggravating circumstances").

*Callahan v. Campbell*, 427 F.3d 897, 937-38 (11th Cir. 2005).

Indeed, here, the alleged trauma Broadnax cites is many years removed from the murders. Moreover, the evidence belies Dr. Benedict's contentions regarding the alleged impact of the on Broadnax. For example, family members testified that Broadnax is a gifted artist and one nephew added that Broadnax offered him some art instruction. They testified also that Broadnax made small gifts for them from scrap lumber. In addition, counsel testified that Broadnax had "magnificent" handwriting, and, at the hearing, Broadnax's sister Annette read a card that Broadnax sent her on the occasion of her anniversary. The sentiment, apparently composed by Broadnax, demonstrates that he, at least in that instance, did not have difficulty with written composition. Yet, Dr. Benedict diagnosed Broadnax with difficulty with his fine

motor skills and a written expression disorder. But, fine motor skills are necessary for drawing, woodworking, and handwriting. And, a component of the disorder of written expression includes problems with handwriting and composition. Put simply, the testimony of the family belied Dr. Benedict's diagnosis.

The evidence also contradicts Dr. Benedict's opinion that Broadnax would have difficulty making decisions under novel problem-solving conditions. To begin, as trial counsel testified, Broadnax was quick to supply information regarding his alibi, including the 9:00 p.m. phone call to his brother and information that his murdered wife left Welborn at 8:20 p.m. – times when the jury found Broadnax was in Birmingham or returning from Birmingham. And, the evidence showed also that Broadnax hid his bloody uniform and boots, and when these items were subsequently discovered, he explained that he sold or someone had stolen the items long before the murders. While the jury's verdict indicates that it did not believe Broadnax's explanations, the fact that Broadnax provided the police and his counsel with these explanations belies the contention that he has a cognitive disorder severely limiting his ability to plan and to react when faced with novel conditions.

The medical evidence also undermines Dr. Benedict's findings. For example, although the medical record obtained by Dr. Benedict did not report that Broadnax sustained a head injury when he was hit by a car, Dr. Benedict determined

nevertheless that "[a]t the age of 13 Mr. Broadnax was struck by a car such that he was pinned between the car and a brick wall. Physical injuries included a broken leg and fractured pelvis. He was discharged from the hospital with minimal medical care, and the conclusion that there was no head injury was based on the absence of loss of consciousness." Doc. 12, Vol. 36 at 956. He noted:

> Information pertaining to Mr. Broadnax's physical trauma, his experiences during adolescence and adulthood, and his neurocognitive profile lead the evaluator to conclude that, ***despite the negative (i.e., absence of) findings*** from a notably cursory evaluation immediately following his being directly struck by a car, Mr. Broadnax demonstrates the tell-tale signs of a brain injury secondary to closed head trauma. Most telling are his deficits in verbal memory and executive functions mediated by the temporal and frontal lobes — those most vulnerable to the effects of closed head injury, and the extensive compensatory mechanisms he employs in attempting to adapt (e.g., attempting to read lips, asking others to write for him, and heavy reliance on models in the form of received mail, used to remember the way certain words are formed).

*Id*. at 958 (emphasis added). Even if Dr. Benedict is correct, trial counsel's failure to discover Broadnax's alleged closed-head injury, which is not contained in Broadnax's medical records and which the record contains no evidence of anyone mentioning to counsel, is not indicative of an inadequate investigation.

Finally, the evidence presented and proffered by Dr. Benedict "would not be enough to alter the outcome [of the sentencing phase] in the face of the aggravating circumstances." *Ferguson v. Sec'y for Dep't of Corr.*, 580 F.3d 1183, 1202 (11th Cir.

2009). To the contrary, as the Eleventh Circuit has repeatedly held, substantial evidence of aggravating circumstances undermine a showing of prejudice. *See, e.g.*, *Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1268-69 (11th Cir. 2012).[18] Based on Circuit precedent, the strong evidence of four aggravating

---

[18]The *Holsey* opinion contains the following passage:

"This is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak." *Sochor* [*v. Sec'y Dep't of Corr.*], 685 F.3d [1016,] 1030 [(11th Cir. 2012)] (alteration omitted); *accord Kokal* [*v. Sec'y Dep't of Corr.*], 623 F.3d [1331,] 1347 [(11th Cir. 2010)]. Not at all. There was, and is, substantial evidence of aggravating circumstances, which makes it more difficult to establish prejudice under *Strickland*. *See Sochor*, 685 F.3d at 1030-33 (holding that a petitioner did not establish the prejudice prong of *Strickland* in part because there was strong evidence of the aggravating circumstance that the murder was "especially [HAC]"); *Rose v. McNeil*, 634 F.3d 1224, 1242 (11th Cir. 2011)(holding that a petitioner did not establish the prejudice prong of *Strickland* in part because there was "substantial evidence in aggravation"); *Callahan* [*v. Campbell*], 427 F.3d [897,] 938 [(11th Cir. 2005)](holding that strong aggravation "demonstrates the burden a defendant faces when trying to overcome ... harsh aggravating factors with mitigating evidence"); *Kokal*, 623 F.3d at 1347-48 (finding that the Florida Supreme Court's holding that a petitioner had not shown prejudice was not an unreasonable application of *Strickland* in part because "the aggravating circumstances . . . are especially powerful"); *Rutherford v. Crosby*, 385 F.3d 1300, 1316 (11th Cir. 2004)("A third reason why the Florida Supreme Court's decision that [the petitioner] had not established prejudice is not objectively unreasonable is that this is not a case where the weight of the aggravating circumstances or the evidence supporting them was weak."); *Crawford v. Head*, 311 F.3d 1288, 1321 (11th Cir. 2002)(finding no prejudice in part because of the "strength of the evidence both of [the petitioner's] guilt and of the aggravating circumstances"); *Hall v. Head*, 310 F.3d 683, 706 (11th Cir. 2002)(holding "that the state court's calculus as to prejudice was [not] an unreasonable one" in part "because the aggravating evidence is strong"); *cf. Williams* [*v. Allen*], 542 F.3d [1326,] 1343 [(11th Cir. 2008)]("Further supporting a finding of prejudice is the fact that this case is not highly aggravated.").

*Holsey v. Warden, Georgia Diagnostic Prison*, 694 F.3d 1230, 1268-69 (11th Cir. 2012).

circumstances,[19] balanced against the equivocal mitigating evidence,[20] convinces this court that no reasonable possibility exists that the jury would not have recommended a sentence of death had counsel presented evidence of the results of Dr. Benedict's evaluation during the penalty phase of the trial.[21] "[A] reasonable jurist could conclude that the horrific facts of the murder[s] would have completely eviscerated the effect of [evidence of mitigation gleaned from a psychological evaluation, such as that performed by Dr. Benedict]." *See Brooks v. Comm'r, Alabama Dep't of Corr.*, 719 F.3d 1292, 1302 (11th Cir. 2013). Therefore, even if the court assumes trial counsel performance was deficient, it is satisfied, based on a *de novo* review of the record, that Broadnax cannot establish that he was prejudiced by counsel's failure to have him psychologically evaluated before trial.

---

[19] The aggravating circumstances included the kidnapping and beating to death of the four-year-old witness to the beating death of his grandmother by a convicted murderer serving a 99-year sentence.

[20] The mitigation evidence included that Broadnax suffered cognitive impairments and learning disabilities affecting his ability to process language, perhaps from a closed head injury, that he may have been raped and abused as a child, and that he may have tried to kill himself as a teenager.

[21] *See Williams v. Allen*, 458 F.3d 1233, 1245 (11th Cir. 2006)("weak and unpersuasive" mitigating evidence of defendant's "(1) . . . anti-social personality disorder, (2) a non-violent criminal history, (3) an unstable family life, and (4) an extensive alcohol and drug abuse problem" was not sufficient to "have tipped the sentencing scales, especially when the trial court noted that the statutory aggravators far outweighed the mitigating factors").

To close, Broadnax has not demonstrated that his trial counsel were ineffective for failing to have him psychologically evaluated prior to trial. This court finds that most, if not all, fairminded jurists would agree with the ACCA's decision, that "Broadnax failed to prove that his counsel's decision not to seek a psychological evaluation constituted deficient performance." *Broadnax*, 130 So. 3d at 1266. Therefore, habeas relief on this issue is due to be denied.

## B. GUILT PHASE JURY INSTRUCTION – "REASONABLE DOUBT" (Claim J)

Broadnax alleges the jury instruction as to reasonable doubt "violated clearly established United States Supreme Court precedent because it lowered the state's burden of proof." Doc. 1 at 97. Specifically, he contends:

> In *Cage v. Louisiana*, [498 U.S. 39, 41 (1990)] the United States Supreme Court reversed the defendant's conviction because[,] when instructing the jury, the trial court equated reasonable doubt with "grave uncertainty" and "an actual substantial doubt" and stated that they needed to have a "moral certainty" that the defendant was guilty. Such an instructional error is a structural error and requires reversal.

> A close examination of the instruction in this case indicates that it has the same flaws as the instructions in *Cage*. Just as the trial court did in *Cage*, the trial court here equated "reasonable doubt" to a "moral certainty." The court defined the types of doubts that the jury could have as those that are "sensible" and "sound." The court then went on to say that[,] if they did not have an "abiding conviction" that the defendant is guilty, they should find him not guilty. This of course implies the converse, that if they do have an abiding conviction that Mr. Broadnax is guilty, they should convict him.

56

This instruction, when viewed as a whole, lessened the prosecution's burden of proof in this case. The word "conviction," as the trial court used it, means "The mental state or condition of being convinced; strong belief on the ground of satisfactory reasons or evidence; settled persuasion." A "strong belief" is not the same as "beyond a reasonable doubt." When examined as a whole, the trial court's instruction to the jury lowered the prosecution's burden of proof.

*Id*. at 98-99. In rejecting this contention, the ACCA held that "the trial court's definition of reasonable doubt substantially tracks the instruction in the *Alabama Pattern Jury Instructions: Criminal* (3d ed. 1994)," and that "taken as a whole, the instruction adequately defined reasonable doubt so that there is no reasonable likelihood that the jury would have applied it in an unconstitutional manner." *Broadnax*, 825 So. 2d at 199.

In evaluating state-court jury instructions regarding "reasonable doubt," the court is mindful that:

The beyond-a-reasonable-doubt standard is a requirement of due process, "but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course." [*Victor v. Nebraska*, 511 U.S. 1, 5 (1994)]. As long as a trial judge "instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id*. (citation omitted). Taken as a whole, the jury instructions must convey the concept of reasonable doubt correctly to the jury. *Id.* When reviewing the correctness of reasonable-doubt charges, the inquiry is "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on" a lower burden of proof than that required by the

Constitution. *Johnson v. Alabama,* 256 F.3d 1156, 1191 (11th Cir. 2001)(citation and internal quotation marks omitted).

*Icenhour v. Medlin*, 567 F. App'x. 733, 737 (11th Cir. 2014).

A review of the record shows that the state court "convey[ed] the concept of reasonable doubt correctly to the jury."[22] In fact, the trial court repeatedly instructed

---

[22]The relevant portion of the court's instruction to the jury states:

Now, this defendant, as a matter of law, enters into this trial with the presumption that he is not guilty as charged in the indictment, and that is a presumption that he is innocent. . . . And the burden is on the State of Alabama to so convince you from the evidence of the defendant's guilt beyond a  reasonable doubt and to a moral certainty of the guilt of the defendant before you would be authorized to convict. . . .

A reasonable doubt . . . may grow out of all of the evidence, it may grow out of a part of the evidence, or it may grow out of a lack of the evidence.  The terms "reasonable doubt" and "moral certainty" are equivalents of each other.  And this means that if you are convinced from the evidence of the defendant's guilt beyond a reasonable doubt, then you would be convinced to a moral certainty.  And, of course, the reverse of this is true.

The term "reasonable doubt" is self-defining.  It means a doubt that is reasonable, a doubt for which a reason can be given.  And by reason, the law means a sound, sensible reason.  And since this is true, a reasonable doubt does not mean an imaginary doubt, a speculative doubt, or a fanciful doubt.  It means just as it says, a reasonable doubt.

Moral certainty does not mean to a mathematical certainty, . . . The best way I know of putting this, ladies and gentlemen:   If after a full and fair consideration of all of the evidence . . . , there remains in your minds an abiding conviction that the defendant is guilty as charged, then you would be so convinced beyond a reasonable doubt.  And in that event, the defendant should be convicted.  On the other hand, if after that same full and fair consideration of all of the evidence . . . there does not remain in your minds an abiding conviction that the defendant is guilty as charged, then you would not be so convinced beyond a reasonable doubt.  And in that event, the defendant should be acquitted.
          . . .
A person charged with a felony should not be convicted unless the evidence excludes

the jury that the State had the burden of proving each element of each count beyond a reasonable doubt.[23]  And, the court informed the jury that only if the State met this burden of proof could the jury find Broadnax guilty.[24]  Otherwise, the court instructed the jury that it must find Broadnax not guilty if it is not convinced by the evidence of Broadnax's guilt as to each element of each of the four counts.[25]  Taken as a whole,

---

to a moral certainty every reasonable hypothesis but that of his guilt.  No matter how strong the circumstances are, they do not come up to the full measure of proof which the law requires if they can be reasonably reconciled for the theory that he is innocent.

Now, the test of the sufficiency of circumstantial evidence is whether the circumstances, as proven, produce a moral conviction to the exclusion of all reasonable doubt of the guilt of the accused. . . . You must be convinced from the evidence of the defendant's guilt beyond a reasonable doubt and to a moral certainty before you would be authorized to convict.  And the burden is on the State of Alabama to so convince you from the evidence.

Doc. 12,Vol. 8, Tab 19 at 253-56, 262-63, 264-65.

[23]*See, e.g.*, doc. 12,Vol. 8, Tab 19  at 269 ("[T]o convict, the State must prove beyond a reasonable doubt each of the following elements of an intentional murder of two or more persons," which was Count 1 of the Indictment); *see also id*. at 260-61, 272-73, 275, 277-78, 279, 283.

[24]*See, e.g.*, doc. 12,Vol. 8, Tab 19  at 285 ("[I]f after a full and fair consideration of all the evidence in this case, if you are convinced from the evidence beyond a reasonable doubt and to a moral certainty, that the defendant is guilty of the offense of capital murder as charged in Count 1 of the indictment, then the form or your verdict should be:  We, the jury, find the defendant guilty of capital murder as charged in Count 1 of the indictment."); *see also id*. at 273, 277-78, 282, 284, 286, 287, 288-89.

[25]*See, e.g.*, doc. 12,Vol. 8, Tab 19 at 285-86 ("However, if you are not so convinced from the evidence beyond a reasonable doubt and to a moral certainty that the defendant is guilty of the offense of capital murder as charged in the indictment, then the form of your verdict should reflect that finding.  And in that event, the form of your verdict should be:  We, the jury, find the defendant not guilty as charged in Count 1 of the indictment."); *see also id*. at 273, 278, 282, 284-85, 286-87, 289.

by "[e]mphasizing the state's burden and the jury's obligation to focus on the evidence presented, the entire instruction establishes it was not reasonably likely the jury applied the instruction in an unconstitutional manner." *Icenhour*, 567 F. App'x. at 737 (citing *Victor*, 511 U.S. at 5; *Johnson,* 256 F.3d at 1190-94). Most, if not all, fairminded jurists would agree with the ACCA's decision that "the trial court's instruction to the jury on reasonable doubt, . . . taken as a whole, . . . adequately defined reasonable doubt so that there is no reasonable likelihood that the jury would have applied it in an unconstitutional manner." *Broadnax*, 825 So. 2d at 199. Therefore, Broadnax is not entitled to relief on this issue.

## C. COURT'S PENALTY PHASE INSTRUCTIONS

Broadnax also challenges comments the court made to the jury during the penalty phase of the trial.

### 1. Whether the Court Issued an Instruction That Created a Presumption that Death was a Proper Punishment (Claim H)

Broadnax argues that the trial court's instructions to the jury at the beginning of the penalty phase created a presumption that death was the appropriate punishment.[26]   Doc. 1 at 90. Relevant here, immediately after polling the jury

---

[26] As Broadnax puts it, "[i]t is essential that the capital-sentencing process allows the jury to consider all mitigation evidence relevant to the offender or the offense. The trial court's statement to the jury violates the Eighth Amendment because it implied to the jury that once it found an aggravating circumstance, the proper sentence is death unless the defendant introduces mitigation

regarding the guilty verdicts they rendered, the court stated, in part, that "what will be presented will be aggravating circumstances . . . by the State, which would tend to cause the jury to return a verdict recommending death . . . and mitigating circumstances . . . by the defense, which would tend to try to get the jury to return a verdict . . . imposing life in the penitentiary without parole."[27] Doc. 12, Vol. 8 at 300-

---

evidence sufficient to outweigh the aggravating evidence."  Doc. 1 at 91-92 (footnotes omitted).

[27]The court stated in relevant part:

Now, ladies and gentlemen, at the jury selection process, you were told that in the event that the jury did find the defendant guilty of capital murder, that we would go into a sentencing hearing, which we will do . . . [in] just a few minutes.

Now, what the sentencing hearing is, is a hearing similar to the guilt phase of the trial.  I have never known one to take that long, but usually – well, I don't know what evidence will be presented.  But what will be presented will be aggravating circumstances presented by the State, which would tend to cause the jury to return a verdict recommending death by electrocution and mitigating circumstances as presented by the defense, which would tend to try to get the jury to return a verdict finding – or imposing life in the penitentiary without parole.

Now, these are advisory verdicts, so that ultimately the decision is made by the Court.  But these are advisory verdicts rendered by the jury, which you feel are most appropriate in this case.

After you have been presented evidence first by the State, then by the defense, then we will have summation. And then after that, I will recharge you as to the manner in which you are to consider the evidence that you have heard in this punishment phase.

So before we go into that hearing, let me send you back to the jury room for just a few minutes, . . . And as soon as we are ready to proceed, then we will bring you back out and we will proceed with the punishment phase of the proceedings.

Doc. 12, Vol. 8 at 300-02.

02. Broadnax asserts this statement infected the jury's evaluation of the case during the penalty phase.

The ACCA "reject[ed] Broadnax's contention that the trial court's comment created a presumption of death." *Broadnax*, 825 So. 2d at 211. It noted that the trial court had instructed the jury that the State had the burden to prove any aggravating circumstances beyond a reasonable doubt and that the aggravating circumstances must outweigh the mitigating circumstances before it could recommend the penalty of death. *Id*. The court also found that "[a]ny misunderstanding that may have been caused by the trial court's earlier comment was cured by [a later] instruction."[28] *Id*.

Broadnax contends that the trial court's statement "violate[d] the Eighth Amendment because it implied to the jury that once it found an aggravating circumstance, the proper sentence is death unless the defendant introduces mitigation

---

[28]At the end of the penalty phase, the trial judge charged the jury, in part:

While it is your duty to follow the instructions which the Court has given you, no statement, question, ruling, remark, or other expression that I have made at any time during this trial, either during the guilt phase or during the sentence hearing is intended to indicate any opinion of what the facts are or what the punishment should be.

It is your responsibility to determine the facts and fix the punishment; and in doing so, you should not be influenced in any way by what you may imagine to be my views on such subject.

*Broadnax,* 825 So. 2d at 211 (quoting doc. 12, Vol. 8, Tab 26 at 355).

evidence sufficient to outweigh the aggravating evidence." Doc. 1 at 91-92. The record does not support this contention. To begin, *Roberts v. Louisiana*, 431 U.S. 633, 637 (1977), which Broadnax cites, stands for the broad proposition that "it is essential that the capital-sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or the particular offense." *Id*. The alleged improper comment did not limit the jury's consideration of any mitigating circumstance, and, as such, did not violate *Roberts*.

Moreover, even if the trial court's comment constituted error, it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The trial judge made the challenged comment during the transition from the guilt to the penalty phase. Taken in context, the comment merely explained to the jury the sequence the penalty proceeding would follow, described the distinction between aggravating and mitigating circumstances, and informed the jury the party who will present each type of evidence. Contrary to Broadnax's contention, the trial judge's comment did not imply that Broadnax had the burden to "introduce[] mitigation evidence sufficient to outweigh the aggravating evidence" or outline a scenario when a death verdict would purportedly be automatic. Moreover, the trial court's instructions to the jury at the end of the penalty phase cured any misunderstanding that may have occurred had a

juror misinterpreted the court's earlier comments in the unlikely manner Broadnax proposes. For these reasons, and in light of the horrific circumstances of the crimes and Broadnax's unique characteristics and circumstances, including that he committed these murders while serving time for another murder, Broadnax has failed to establish that the innocuous introductory comment by the trial court had any effect, much less a substantial and injurious one, on the jury's penalty phase verdict. Therefore, habeas relief on this claim is due to be denied.

## 2. Whether the trial court erred by instructing the jury that Broadnax had to prove mitigating circumstances to a "Reasonable Satisfaction" – Harmless Error (Claim D)

Broadnax asserts next that the trial judge erred by instructing the jury that Broadnax "had to prove mitigating circumstances to the jury's 'reasonable satisfaction.'"[29] Doc. 1 at 76-77. To Broadnax, the state courts' "conclusion

---

[29]The relevant instruction the jury stated:

Now, instructing you on aggravating or mitigating circumstances, that does not assume or mean to assume as true any matter referred to in these instructions concerning aggravating or mitigating circumstances, but it leaves, instead to you, for you to determine what the facts are and what the punishment should be.
        . . . .
Now, the law of this State provides a list of some of the mitigating circumstances which you may consider. But that list is not a complete list of the mitigating circumstances you may consider. There are others I will instruct you on later.

Now, by reading the list of these mitigating circumstances on which you may consider from the evidence . . it is not the Court saying that these mitigating circumstances do exist, but these are statutory mitigating circumstances on which I charge you and for you to consider. *And these mitigating circumstances must be only*

that this error was harmless is an unreasonable application of clearly established

federal law, . . . ." *Id*.  He argues that the instruction prejudiced him, taking it outside

the harmless error sphere, "because it skewed the jury's analysis of the mitigation

---

*established from the evidence only to your reasonable satisfaction. . . .*
> . . . .

Now, in addition to these seven . . . statutory mitigating circumstances that I have just given to you, you may also consider . . . any aspect of the defendant's character and life and any of the circumstances of the capital offense which tend to indicate that the defendant should not be sentenced to death.

Mitigating circumstance does not have to be included in the list which I have read to you in order for it to be considered by you. . .

If you are satisfied from the evidence presented . . . that a mitigating circumstance exists in this case, then you may consider it.  *A mitigating circumstance need merely be proven to your reasonable satisfaction and not beyond a reasonable doubt and to a moral certainty*.
> . . . .

Now, ladies and gentlemen, if after a fair consideration of all of the evidence . . . , if you are convinced beyond a reasonable doubt to a moral certainty that aggravating circumstances do exist and that they outweigh, or that *there are no mitigating circumstances proven to your reasonable satisfaction*, the form of your verdict should be: 'We, the jury, fix the punishment of the defendant, Donald Broadnax, as death by electrocution.'
> . . . .

*If you are reasonably satisfied as to the existence of any mitigating circumstances*, and if, in your judgment, those mitigating circumstances outweigh the aggravating circumstances − . . . It is not the number of aggravating circumstances versus mitigating circumstances, or mitigating circumstances versus aggravating circumstances, *but the seriousness of the aggravating circumstances and the mitigation as shown to your reasonable satisfaction*. . . . .

*And if you are reasonably satisfied that mitigating circumstances exist* and that they outweigh the aggravating circumstances, then the form of your verdict should be: 'We, the jury, fix the punishment of Donald Broadnax at life imprisonment without parole.'"

*Broadnax*, 825 So. 2d at 212-13 (quoting doc. 12, Vol. 8, Tab 26 at 342-57).

evidence and could have led [the jury to conclude] that there was no mitigation evidence, even though some jurors believed there was." *Id*. at 77-78.

Although the ACCA held that the court's instructions were erroneous,[30] it found the error harmless, noting that:

> The evidence in support of the aggravating circumstances is overwhelming; the evidence in support of the mitigating circumstances is minimal. In light of the overwhelming evidence presented in support of the aggravating circumstances, there is no question, that, had the jury been properly instructed, it would still have recommended death as the penalty. The facts presented to the jury established, beyond any doubt, that the aggravating circumstances clearly outweighed the mitigating circumstances. Even if the jury had been properly instructed and had found that the mitigating circumstances existed, the aggravating circumstances overpower any mitigation. Because we conclude that the evidence, as presented, conclusively establishes, that no rational jury, properly instructed, could have found otherwise, the trial court's erroneous instruction was harmless.

*Broadnax,* 825 So. 2d at 216. And, the Alabama Supreme Court affirmed, finding that the instruction had no impact on the jury's recommendation or on the trial court's sentence of death.[31]

---

[30]The court held – "The defendant has the burden of interjecting a mitigating circumstance; he does not, as the trial court's instruction suggests, have to establish the existence of a mitigating circumstance to the reasonable satisfaction of the jury." *Broadnax*, 825 So. 2d at 214.

[31]The Alabama Supreme Court found:
In the trial court's instruction to the jury during the penalty phase, the trial court stated: "*these mitigating circumstances must be only established from the evidence only to your reasonable satisfaction.*" As the [ACCA] held, this instruction was erroneous. Therefore, we must determine if the [ACCA] improperly concluded that the error was harmless.

"[H]armless-error analysis applies to instructional errors so long as the error at issue does not categorically vitiate all the jury's findings." *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008)(internal citations and quotations omitted). "[A] federal court may grant habeas relief based on trial error only when that error had substantial and

> . . .
>
> [A]n erroneous instruction on the consideration to give mitigating evidence is subject to a harmless-error review. . . . .
>
> Here, three aggravating circumstances were established beyond a reasonable doubt as evidenced by the jury's verdicts from the guilt phase. A review of the record adequately supports the finding that the killings of Jan and DeAngelo were "especially heinous, atrocious, or cruel" when compared to other capital offenses, . . . . Thus, the state presented compelling evidence of the aggravating circumstances.
>
> Although the defense was not limited in presenting evidence of mitigating circumstances, the mitigating evidence was minimal. Broadnax argued that because the murders were committed shortly after he had been denied parole, he was "under the influence of extreme mental or emotional disturbance" when he committed the murders, . . . He also presented testimony from his sister Dorothy McKinstry of nonstatutory mitigating circumstances.
>
> During the argument portion of the penalty phase, both the state and defense counsel argued that it was proper for the jury to consider the mitigating evidence . . . presented. The trial court stated in its order imposing the death sentence that, when it weighed the aggravating and mitigating circumstances, it considered "all of the matters that were presented . . . , the testimony heard at trial and the sentencing hearing . . . , both in mitigation and by aggravation."
>
> After carefully reviewing all the evidence presented during the penalty phase, we unhesitatingly conclude that even if the jury had been properly instructed on the consideration it should give the statutory and nonstatutory mitigating circumstances, the jury would have recommended a death sentence . . . Moreover, the trial court's sentencing order indicates that it gave the mitigation evidence proper consideration. Considering the totality of the circumstances, we hold that the jury instruction, although erroneous, had no impact on the jury's recommendation or on the trial court's sentence of death.

*Ex parte Broadnax*, 825 So. 2d at 235-37 (emphasis in original).

injurious effect or influence in determining the jury's verdict," *Calderon v. Coleman*, 525 U.S. 141, 145 (1998)(quoting *Brecht*, 507 U.S. at 637)(internal quotations omitted), "that is, more than a reasonable possibility that the error contributed to the sentence," *Horsley v. Alabama*, 45 F.3d 1486, 1493 (11th Cir. 1995). The *Brecht* standard –

> reflects the presumption of finality and legality that attaches to a conviction at the conclusion of direct review. It protects the State's sovereign interest in punishing offenders and its good-faith attempts to honor constitutional rights, while ensuring that the extraordinary remedy of habeas corpus is available to those whom society has grievously wronged.
>
> A federal court upsets this careful balance when it sets aside a state-court conviction or sentence without first determining that the error had a substantial and injurious effect on the jury's verdict. The social costs of retrial or resentencing are significant, and the attendant difficulties are acute in cases such as [*Calderon*], where the original sentencing hearing took place in November 1981, some 17 years ago. The State is not to be put to this arduous task based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.

*Calderon*, 525 U.S. at 145-46 (internal citations and quotations omitted).

The court finds that Broadnax has failed to show actual prejudice rather than mere speculation of such. A review of the record shows that the trial court's instructions did not have a substantial and injurious effect or influence on the death sentence in this case. First, even if the court assumes the mitigating factors of

"emotional distress and a cruel childhood," which were before the jury, "the full force of the savage facts of [these] crime[s]," *Horsley*, 45 F.3d at 1492, are such that no jury would have found that the mitigating circumstances outweighed the aggravating circumstances. Second, the sentencing court and the state appeals courts reviewed independently the aggravating and mitigating circumstances, and each court found death was the appropriate penalty. *Ex parte Broadnax*, 825 So. 2d at 236-37; *Broadnax*, 825 So. 2d at 214-17 (ACCA opinion); *id*. at 224-26 (ACCA opinion on return from remand); *id*. at 233 (Appendix A, circuit court's sentencing order). "[T]he imbalance between aggravating and mitigating (including nonstatutory factors) circumstances marked by Alabama's appellate courts" is "persuasive, as a factual matter, in [this court's] weighing of injurious effect on the sentencer." *Horsley*, 45 F.3d at 1492. Therefore, after reviewing the record *de novo*, the court finds that the instructional error during the penalty phase was harmless, as it did not have a substantial and injurious effect or influence on the jury's recommendation, or on the trial judge who gave the mitigation evidence needed consideration before deciding to sentence Broadnax to death. As such, habeas relief on this issue is due to be denied.

### 3. Whether the Trial Court Gave an Inaccurate Instruction on Heinous, Atrocious, or Cruel Aggravating Circumstance (Claim E)

Broadnax claims the trial court erred by failing to instruct the jury in such a way as to narrow the vague HAC aggravator.[32] Doc. 1 at 79-80. Specifically, he contends, "[t]he judge instructed the jury on the [HAC] aggravator but did not instruct the jury that they had to find that the murder[s] [were HAC] 'as compared to other capital murders,'" and "the trial court's removal of [this] phrase . . . expanded the [HAC] aggravator." *Id*. (quoting Ala. Code § 13A-5-49(8)). Therefore, he argues, "the aggravator was not properly narrowed, and the Alabama Supreme Court's conclusion to the contrary derived from an unreasonable application of clearly established United States Supreme Court precedent." *Id*. at 81.[33]

---

[32]*See* n.15 *supra.*

[33]The Alabama Supreme Court, citing *Ex parte Kyzer*, 399 So. 2d 330, 334 (Ala.1981), and *Ex parte Bankhead*, 585 So. 2d 112, 124-25 (Ala. 1991), held that "The [ACCA] properly applied the well-established law defining and applying this aggravating circumstance," and that "[d]espite the fact that the trial court's instruction did not include the phrase 'compared to other capital offenses,' the instruction, when reviewed in its entirety, adequately narrowed this circumstance." *Ex parte Broadnax*, 825 So. 2d at 237 (emphasis in original). As the Eleventh Circuit has held:

> Since the 1981 case of *Kyzer v. Alabama*, . . ., the Alabama appellate courts have confined the application of the [HAC] aggravating factor to "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." *Kyzer*, 399 So. 2d at 334 (citing *State v. Dixon*, 283 So. 2d 1 (Fla.1973)). The class of cases that are "unnecessarily torturous to the victim" is not too indefinite to serve the narrowing function mandated by the eighth amendment. *See Proffitt v. Florida*, 428 U.S. 242, 255-56, 96 S. Ct. 2960, 2986, 49 L. Ed. 2d 913 (opinion of Stewart, Powell, Stevens, JJ.), *reh'g denied*, 429 U.S. 875, 97 S. Ct. 198, 50 L. Ed. 2d 158 (1976). Thus, when Lindsey was sentenced in 1982, the courts of Alabama had already developed and consistently applied a narrowing construction of the term "heinous, atrocious or cruel

"A trial judge has considerable discretion in choosing the language of an instruction so long as the substance of the relevant point is adequately expressed." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Here, the trial court instructed the jury "what is intended to be included in these [HAC] aggravating circumstances are those capital offenses . . . where the actual commission of the capital offense was accomplished by such additional act as to set the crime apart from the norm of capital offenses." Doc. 12, Vol. 8, Tab 26 at 346. The trial court added that, "[f]or a capital offense to be especially heinous . . . or atrocious, any brutality which was involved in it must have exceeded that which is normally present in any capital offense," and "[f]or a capital offense to be especially cruel, it must be conscienceless or a pitiless crime which was unnecessarily tortuous to the victim." *Id*. at 346-47.

These instructions required the jury to find the murders were heinous, atrocious, or cruel as compared to other capital murders, even if the trial court did not quote the language of the statute. The substance of the "compared to other capital offenses" requirement was adequately expressed in the trial court's instructions to the jury that, to find Broadnax's murders of the two victims satisfied the aggravator, they had to find (1) additional acts that set apart these murders from the norm, (2) that the

---

as compared to other capital offenses."

*Lindsey v. Thigpen*, 875 F.2d 1509, 1514 (11th Cir. 1989).

murders were more brutal than the normal capital offense, and (3) that Broadnax was unnecessarily torturous to his victims. This court finds no error in the Alabama Supreme Court's decision that, "[d]espite the fact that the trial court's instruction did not include the phrase 'compared to other capital offenses,' the instruction, when reviewed in its entirety, adequately narrowed this circumstance." *Ex parte Broadnax*, 825 So. 2d at 237. Therefore, because most, if not all, fairminded jurists would agree, habeas relief on this issue is due to be denied.

### 4. Whether the Trial Court Erred by Instructing the Jury Regarding the Advisory Nature of Jury's Recommendation of Death (Claim I)

Broadnax argues next that the court erred by instructing the jury that their recommendation of a sentence was only advisory, stating:

> In *Caldwell v. Mississippi*, [472 U.S. 320 (1985),] the . . . Court held that it was improper for a judge or prosecutor to inform the jury that their decision was reviewable. Here, the judge and the prosecutor stressed to the jury that their verdict was merely advisory. The judge and prosecutor trivialized the jury's role in the proceedings by not explaining to them that their decision must be given some weight as the judge is determining the ultimate sentence. The Court of Criminal Appeals rejected this argument because it found that the statements were a correct recitation of Alabama law. This conclusion is both an unreasonable application of *Caldwell* and an unreasonable determination of the facts.

Doc. 1 at 92-93 (footnotes omitted). Although Broadnax concedes that the trial court's statement to the jury regarding the advisory nature of its verdict was

"accurate," *id*. at 95, he contends *Caldwell* held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere," *id*. at 94 (quoting *Caldwell*). He argues that "*Caldwell* does not have a 'correctness' exception," and that the ACCA "unreasonably applied clearly established federal law when it concluded that *Caldwell* was not violated because the trial court's statement was correct." *Id*. at 96.

"To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994)(quoting *Dugger v. Adams*, 489 U.S. 401, 407 (1989)). As the Court explained,

> The plurality [in *Caldwell*] concluded that the prosecutor's remarks, along with the trial judge's affirmation, impermissibly "minimize[d] the jury's sense of responsibility for determining the appropriateness of death." *Id*., at 341, 105 S. Ct., at 2646. Such a diminution, the plurality felt, precluded the jury from properly performing its responsibility to make an individualized determination of the appropriateness of the death penalty. *Id*., at 330-331 . . . Justice O'Connor, in her opinion concurring in part and concurring in the judgment, identified more narrowly the infirmity in the prosecutor's remarks: "In my view, the prosecutor's remarks were impermissible because they were inaccurate and misleading in a manner that diminished the jury's sense of responsibility." *Id*., at 342 . . . .

As Justice O'Connor supplied the fifth vote in *Caldwell*, and concurred on grounds narrower than those put forth by the plurality, her position is controlling. . . . Accordingly, we have since read *Caldwell* as "relevant only to certain types of comment – those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright*, 477 U.S. 168, 184, n.15, 106 S. Ct. 2464, 2473, n.15, 91 L. Ed. 2d 144 (1986). Thus, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, . . . .

*Id*. at 8-9. Here, however, Broadnax concedes that the trial court's statement was "accurate." Doc. 1 at 95. Therefore, he has no claim that the ACCA unreasonably applied *Caldwell* to his case, and habeas relief on this issue is due to be denied.

## D.  ERRORS IN THE TRIAL COURT'S SENTENCING ORDER  (Claim F)

Broadnax challenges next the trial court's sentencing order: "The trial court made numerous factual and legal errors in Mr. Broadnax's sentencing order. He did so even after the [ACCA] remanded the case to correct those errors. These errors indicate that he did not consider mitigation." Doc. 1 at 81. Broadnax adds that:

The [ACCA's] conclusion that the sentencing order was satisfactory constitutes an unreasonable application of *Woodson*, *Lockett*, and *Brown*.[34] The trial court's inclusion of events that did not occur and his warping of the testimony indicates that he was not giving Mr. Broadnax the individualized consideration the Constitution requires. Even more than the trial court's three failed attempts at writing an accurate order is

---

[34]*See California v. Brown*, 479 U.S. 538 (1987); *Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280 (1976).

the way the mitigation evidence was treated.  The trial court took
Dorothy McKinstry's testimony and turned it into a diagnosis of
anti-social personality disorder, something that is typically considered
harmful, not helpful.  There was no mental health expert testimony
presented, and in fact, . . . Mr. Broadnax's attorneys never had him
evaluated for mental health issues.  The [ACCA's] conclusion that the
trial court gave the mitigation evidence the proper constitutionally
required review is an unreasonable application of clearly established .
. . precedent.

*Id.* at 83-85 (original footnotes omitted; footnote added).

The only specific portion of the third and final sentencing order Broadnax

objects to is the trial court's treatment of Dorothy McKinstry's testimony.  In

particular, Broadnax challenges the court's statement that "[t]he Defense [had]

presented testimony by the Defendant's sister concerning the manner in which the

Defendant was reared and his antisocial behavior during his teenage years."

*Broadnax*, 825 So. 2d 134, 227 (Appendix A).  The trial court stated that Dorothy

McKinstry testified that Broadnax "did not have normal social contact with people

and that he never really learned how to behave around other people," and that he did

not have "very many friends."  *Id.* at 229.  And, viewing this testimony in the "most

favorable light" to Broadnax, the trial court found Mrs. McKinstry "may have

testified to" a "mitigating circumstance of an antisocial personality disorder."  *Id.* at

233.  Still, the trial court found that, even "if this [antisocial behavior/antisocial

personality disorder] is a mitigating circumstance, . . . it is totally outweighed by the

aggravating circumstances as presented by the evidence." *Id*. The ACCA affirmed,

finding that "[a]fter an independent weighing [of the aggravating circumstance and

the mitigating circumstances], . . . that the sentence of death is the appropriate

sentence in this case." *Id*. at 225.

According to Broadnax, the ACCA's finding "that the sentencing order was

satisfactory" is an unreasonable application of *Woodson*, *Lockett*, and *California*.[35]

But, the trial court's third sentencing order and the ACCA's opinion establish

unequivocally that these courts considered Dorothy McKinstry's testimony and

accorded Broadnax the required "individualized sentencing."[36] Consideration of

mitigation evidence does not mean, however, that the court has to give the evidence

any specific weight. To the contrary, as the Court held in *Kansas v. Marsh,*

> In aggregate, [Supreme Court] precedents confer upon defendants the
> right to present sentencers with information relevant to the sentencing
> decision and oblige sentencers to consider that information in
> determining the appropriate sentence. The thrust of [Supreme Court]
> mitigation jurisprudence ends here. "[The Court has] never held that a
> specific method for balancing mitigating and aggravating factors in a
> capital sentencing proceeding is constitutionally required." *Franklin* [*v.*
> *Lynaugh*, 487 U.S. 164,] 179, 108 S. Ct. 2320 [(1988)(plurality
> opinion)](citing *Zant* [*v. Stephens*, 462 U.S. 862,] 875–876, n.13, 103
> S. Ct. 2733 [(1983)]). Rather, [the] Court has held that the States enjoy

---

[35] *See* n.34 *supra.*

[36] *See Kansas v. Marsh*, 548 U.S. 163, 174 (2006)("The use of mitigation evidence is a product of the requirement of individualized sentencing.")(citing *Graham v. Collins*, 506 U.S. 461, 484-89 (1993) (Thomas, J., concurring)).

"'a constitutionally permissible range of discretion in imposing the death penalty.'" *Blystone* [*v. Pennsylvania*], 494 U.S. [299,] 308, 110 S. Ct. 1078 [(1990)](quoting *McCleskey v. Kemp*, 481 U.S. 279, 305-306, 107 S. Ct. 1756, 95 L. Ed. 2d 262 (1987)). See also 494 U.S., at 307, 110 S. Ct. 1078 (stating that "[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence"); *Graham, supra*, at 490, 113 S. Ct. 892 (THOMAS, J., concurring)(stating that "[o]ur early mitigating cases may thus be read as doing little more than safeguarding the adversary process in sentencing proceedings by conferring on the defendant an affirmative right to place his relevant evidence before the sentencer").

548 U.S. at 175. Stated differently,

The United States Supreme Court has held [only] that the Eighth and Fourteenth Amendments require that a sentencer not be prohibited from considering as mitigation "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Eddings v. Oklahoma*, 455 U.S. 104, 110, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978)). The trial court may determine the appropriate weight to be afforded such mitigation, but it may not exclude such evidence, as a matter of law, from consideration altogether. *Id*. at 114-15, 102 S. Ct. 869. As we have explained, however, the Constitution "does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight." *Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006). All that is forbidden is for sentencing courts to give mitigating evidence "no weight *by excluding such evidence from their consideration.*" *Eddings*, 455 U.S. at 115, 102 S. Ct. 869 (emphasis added). Thus, our consideration is "completed once it is established that a full hearing was conducted in which appellant's counsel was given an opportunity to present all of the mitigation evidence." *Baldwin v. Johnson*, 152 F.3d 1304, 1323 (11th Cir. 1998) (quoting *Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir. 1984)).

*Clark v. Attorney Gen., Fla.*, 821 F.3d 1270, 1286-87 (11th Cir. 2016).

A review of the third sentencing order shows that the trial court "considered" the substance of Dorothy McKinstry's testimony. To the extent Broadnax's claim is based on the trial court's alleged assumption that this testimony supported a finding that Broadnax suffered from anti-social personality disorder,[37] he has not shown that such an assumption was an unreasonable application of Supreme Court precedent,[38] or that Supreme Court cases establish clearly that the trial court, as the sentencer, could not give this effect to the testimony. And, to the extent the trial court erred in assuming that Dorothy McKinstry testified that Broadnax suffered from anti-social personality disorder, the error did not have a substantial and injurious effect on Broadnax's sentence. *See Schwab*, 451 F.3d at 1330. The ACCA found, "[a]fter an independent weighing [of the aggravating and mitigating circumstances], . . . that the

---

[37]The trial court stated:

The Court, in considering the testimony of the Defendant's sister, even in the most favorable light on behalf of the Defendant found that any mitigating circumstance of an anti-social personality disorder that she ***may*** have testified to was greatly out weighed by the aggravating circumstances as presented in the evidence in this case and that even in consideration, ***if*** this is a mitigating circumstance, that it is totally outweighed by the aggravating circumstances as presented by the evidence.

*Broadnax*, 825 So. 2d at 233 (Appendix A)(emphasis added).

[38]*See Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006)("The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight.").

sentence of death is the appropriate sentence in this case," and "that similar offenses have been punished with sentences of death." *Broadnax*, 825 So. 2d at 225 (citing, *inter alia*, *Ex parte Melson*, 775 So. 2d 904 (Ala. 2000); *Ex parte Ingram*, 779 So. 2d 1283 (Ala. 2000); *Ferguson v. State*, 814 So. 2d 925 (Ala. Crim. App. 2000); *Ex parte Borden*, 769 So. 2d 950 (Ala. 2000); *Ward v. State*, 814 So. 2d 899 (Ala. Crim. App. 2000); *Perkins v. State*, 808 So. 2d 1041 (Ala. Crim. App. 1999)). Based on a review of the record, this court finds "[t]here is no possibility that any error the judge may have made in [assuming that Dorothy McKinstry's testimony] offered in mitigation [described Broadnax as suffering from an antisocial personality disorder] had any effect or influence on his sentencing decision, much less a substantial and injurious one." *See Schwab*, 451 F.3d at 1330.

To close, Broadnax has failed to demonstrate that the ACCA's rejection of this claim applied law contrary to established Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent. Nor has Broadnax established that the trial court's consideration of McKinstry's testimony had a substantial and injurious influence on his sentence. Therefore, Broadnax is not entitled to habeas relief on this ground.

## E. PROSECUTORIAL MISCONDUCT

Broadnax challenges also allege misconduct by the prosecutor during closing arguments.

## 1. Whether Purported Comments About Broadnax's Silence Violated the Fifth Amendment (Claim G)

Broadnax argues that the prosecutors violated his constitutional right to remain silent by making two references to his failure to testify during closing arguments. Doc. 1 at 86. "[T]he Fifth Amendment, in its . . . bearing on the States by reason of the Fourteenth Amendment, forbids . . . comment by the prosecution on the accused's silence." *Griffin v. California*, 380 U.S. 609, 615 (1965). But, "[a] comment on the failure of the *defense*, as opposed to that of the *defendant*, to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's fifth amendment privilege." *Duncan v. Stynchcombe*, 704 F.2d 1213, 1215-16 (11th Cir. 1983)(emphasis in original; citation omitted). As explained by the Eleventh Circuit,

> The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify. A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was *manifestly* intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury *necessarily* would have done so. The defendant bears the burden of establishing the existence of one of the two criteria. The comment must

be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement.

*United States v. Knowles*, 66 F.3d 1146, 1162-63 (11th Cir. 1995)(emphasis in original; quotations and footnotes omitted). With this background in mind, the court turns now to Broadnax's specific contentions.

### a. "Are they giving me another reasonable explanation for this?"

Broadnax contends that the prosecutor commented on his failure to testify by saying to the jury that they should question whether defense counsel "are . . . giving me another reasonable explanation for this?" Doc. 1 at 86-87 (quoting doc. 12, Vol. 7 at 161). He argues, "[w]hen viewed in context, . . . [i.e. that] [t]his statement was made before the defense had the opportunity to make its closing argument to the jury[,] . . . it could only have been designed to make the jury believe that Mr. Broadnax had to explain these things to the jury." *Id*. at 89. But, in context, the prosecutor's statements do not "manifestly" comment on Broadnax's failure to testify, nor are they of such a character that the jury would naturally and necessarily take them as such.[39] To the contrary, the statements refer specifically to Broadnax's

_____

[39]The relevant portion of the prosecutor's argument consisted of the following:

The Judge is going to give you an instruction on circumstantial evidence. And I think it will be something like this: To convict on circumstantial evidence alone, there cannot be any other reasonable explanation for this set of circumstances. I like to turn that around a little bit, because the flip side of that is true also. If you look at all the circumstances and you determine that there is no other reasonable explanation for

attorneys and the explanation they will offer during their closing argument to counter the circumstantial evidence. In particular, the prosecutor asked the jury to consider whether Broadnax's attorneys offered a reasonable explanation for the presence of the victims' blood on Broadnax's boots, which Broadnax told Det. Cunningham he sold to a "white guy" a year before the murders, and on his work uniform, which he told Det. Cunningham someone had stolen, and how these articles had ended up in the WRC after the murders. The prosecutor did not tell the jury – directly or indirectly – that they should find Broadnax guilty because of his failure to counter this circumstantial evidence. Instead, the prosecutor asked the jury specifically to consider whether, during closing argument, Broadnax's attorneys offered a reasonable explanation of the circumstantial evidence. As such, the prosecutor's closing argument neither manifestly commented on Broadnax's failure to testify nor was it

---

all these things, then he's guilty, and you have to find him guilty if there's no other reasonable explanation.

And he's got two fine attorneys. And what I want you to be thinking the whole time they're up here is: Are they giving me another reasonable explanation for all of this? Are they explaining this in a reasonable way? Does it make sense, or is it like that little boy with the cookie stains on his mouth saying that Martians beamed into the kitchen and took that bite out of the cookie? I mean, I don't know what their story is. Is it that this white guy that he supposedly sold these boots to a year before was picked up [as] a hitchhiker by Jan and killed her. And then, in the meantime, had broken into [the WRC] and stole some of his uniforms and then brought them back into [the WRC], with his boots and uniforms and framed him? And if so, what is the person's motives? Look at whether they provide you with a reasonable explanation.

Doc. 12, Vol. 7, Tab 16 at 160-62.

of such a character that the jury naturally and necessarily would take it as a comment on Broadnax's failure to testify.

>**b.  "There's absolutely no tape of this defendant that's been played in here where [Broadnax] was saying, 'I tried to call my brother.'"**

Broadnax argues next that "[t]he prosecutor made one reference to [his] failure to testify in reference to whether [he] called his brother during the evening that his wife and grandson were murdered."  Doc. 1 at 87 (quoting doc. 12, Vol. 8 at 246-47. At issue here are comments the parties made during their respective closing arguments.  Specifically, in closing, Broadnax's attorney repeatedly referred to statements Broadnax made to Det. Cunningham that he purportedly "tried" to call his brother –

- "[Detective Vince Cunningham] talked to Donald the next [day], and y'all will remember, he said he talked to Donald on the 26th. The murder occurred on the 25th.  Donald told him, 'I was on the phone trying to make a call to my brother.'  Vince asked him what time was that.  He said, 'About 9:15.'" Doc. 12, Vol. 8 at 220.

- "Johnny Baker told Vince Cunningham at a later date, 'I saw him on the phone at 9:15,' you see.  That coincides exactly with what Vince had got from [Broadnax] when he talked to him on the 26th.  [']I was on the phone at 9:15 trying to call my brother.[']" *Id.*

- "[The prosecutor,] Mr. Cochran, being the good lawyer he is, he stood and told you that the tape recording said, 'I was talking to my brother.'  That was not what Cunningham said, and that is not

what that tape said.  What it said was, 'I was trying to call my brother.'" *Id*. at 220-21.

And, in response to these statements by Broadnax's counsel, the prosecutor in rebuttal argued her view of the evidence – that Det. Cunningham did not testify that Broadnax told him he had "tried" to call his brother and that the tape-recorded statement Broadnax gave Det. Cunningham did not contain any such statement.[40]

Based on the record and viewing the prosecutor's argument in context, the court finds no error in the state court's determination that the prosecutors did not comment on Broadnax's failure to testify.[41]  Broadnax has failed to demonstrate that

---

[40]The prosecutor said –
There's absolutely no tape of this defendant that's been played in here where he was saying, "I tried to call my brother."  Again, that came from Mr. Bender who has not taken the oath.  There was no testimony of [Broadnax] saying, "I tried to call my brother."  What did Detective Cunningham say?  ["Broadnax] said, [']I called my brother.[']"  And Detective Cunningham asked him for the number so he could check it out.

Now, do you think if he had said, "I didn't reach him," don't you think these lawyers are good enough to have asked Detective Cunningham that if it had been said?  Absolutely.

Doc. 12, Vol. 8, Tab 18 at 247.

[41]The ACCA rejected this claim. After noting that defense counsel had argued that Broadnax told Det. Cunningham that he had "tried" to call his brother from the Welborn break room, the ACCA held that the prosecutor's argument in rebuttal was proper:

When viewing the entire context of the prosecutor's closing argument, it is obvious that the prosecutor was not commenting on Broadnax's failure to testify.  The state was merely commenting on whether Cunningham's testimony and a tape recording of a statement showed that Broadnax told the police that he had telephoned his brother from Alexander City, or that he had *tried* to telephone him.  The prosecutor

the state court's rejection of this claim applied law contrary to established Supreme Court precedent or in a manner that was objectively unreasonable in light of such precedent. Therefore, Broadnax is not entitled to habeas relief on this issue.

### 2. Whether the Prosecutor Improperly Shifted the Burden of Proof (Claim K)

Broadnax argues next that "[d]uring his first closing argument, the prosecutor told the jury that they should ask whether Mr. Broadnax had given them an explanation for what occurred in this case," and that "[t]his statement impermissibly shifted the burden of proof from the State to Mr. Broadnax . . . ." Doc. 1 at 100. In relevant part, the prosecutor stated in her closing argument that the jury should "be thinking the whole time" during counsel for Broadnax's closing argument whether counsel have provided "another reasonable explanation for [the evidence]."[42] Doc. 12,

─────────────────────

argued that the evidence demonstrated that Broadnax had told Cunningham that he had telephoned his brother at 9:15 p.m. Thus, the prosecutor's argument consisted of a proper argument on the evidence introduced at trial. *Coral v. State,* 628 So. 2d [954,] 985 [(Ala. Crim. App. 1992)].

Given that the defense and the prosecution had conflicting interpretations of the statement made by Broadnax to Cunningham concerning a telephone call on the night of the offense, and that the telephone call was critical to Broadnax's alibi defense, the prosecutor's comment concerning the statement was not improper. Thus, the trial court did not commit plain error in permitting the prosecutor to comment on the statement Broadnax made to Cunningham.

*Broadnax*, 825 So. 2d at 189 (emphasis in original).

[42]In relevant context, the prosecutor argued:

The Judge is going to give you an instruction on circumstantial evidence. And I think

85

Vol. 7, Tab 16 at 151-53, 160-62. On direct appeal, the ACCA rejected Broadnax's

argument that the prosecutor had improperly shifted the burden of proof, finding that

"the state did not attempt to shift the burden of proof to Broadnax," that "[t]here is

no suggestion from the [prosecutor's closing] argument that Broadnax had an

obligation to produce any evidence or to prove his innocence," and that "the trial

court, at the conclusion of the closing arguments, instructed the jury as to the state's

burden of proof and Broadnax's presumption of innocence."[43] *Broadnax*, 825 So. 2d

---

it will be something like this:  To convict on circumstantial evidence alone, there
cannot be any other reasonable explanation for this set of circumstances.  I like to
turn that around a little bit, because the flip side of that is true also.  If you look at all
the circumstances and you determine that there is no other reasonable explanation for
all these things, then he's guilty, and you have to find him guilty if there's no other
reasonable explanation.

And he's got two fine attorneys.  And what I want you to be thinking the whole time
they're up here is:  Are they giving me another reasonable explanation for all of this?
Are they explaining this in a reasonable way?  Does it make sense, or is it like that
little boy with the cookie stains on his mouth saying that Martians beamed into the
kitchen and took that bite out of the cookie?  I mean, I don't know what their story
is.  Is it that this white guy that he supposedly sold these boots to a year before was
picked up . . . hitchhik[ing] by Jan and killed her.  And then, in the meantime, had
broken into work release and stole some of [Broadnax's] uniforms and then brought
them back into work release, with his boots and uniforms and framed him?  And if
so, what is the person's motives?  Look at whether they provide you with a
reasonable explanation.

Doc. 12, Vol. 7, Tab 16 at 151-53, 160-62.

[43]With regard to circumstantial evidence, the trial court instructed the jury:  "[T]he test of
the sufficiency of circumstantial evidence is whether the circumstances, as proven, produce a moral
conviction to the exclusion of all reasonable doubt of the guilt of the accused. . . . [W]hether the
evidence is direct or circumstantial, . . . the burden of proof and the measure of proof remain the
same.  You must be convinced from the evidence of the defendant's guilt beyond a reasonable doubt
and to a moral certainty before you would be authorized to convict.  And the burden is on the State

134, 184-85  Consequently, the court "reject[ed] Broadnax's argument and conclude[d] that no reasonable juror would have construed the state's comment to mean that Broadnax had any burden of proof.  No plain error occurred." *Id*. Broadnax contends that the ACCA's decision finding no plain error is an unreasonable application of *Sandstrom v. Montana* and *In re Winship*.  *Id*. at 101-02 and nn. 287-288, 290-91 (citing *Sandstrom v. Montana*, 442 U.S. 510, 513, 525 (1979) and *Estelle v. Williams*, 425 U.S. 501, 503 (1976)(quoting *In re Winship*, 397 U.S. 358 (1970)).

With regard to improper argument from a state prosecutor, the Eleventh Circuit has held:

> The Supreme Court declared in *In re Winship* that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L. Ed. 2d 368 (1970).  Additionally, the Supreme Court has held that a defendant does not have to disprove anything nor prove innocence, and state-created presumptions to the contrary are violative of due process.  *See Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979); *Mullaney v. Wilbur*, 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975).
>
> [The Eleventh Circuit], in recognizing the government's burden and obligation of proving guilt beyond a reasonable doubt, has recognized that a prosecutor's comment may be so prejudicial as to shift the burden of proof.  *See Duncan v. Stynchcombe*, 704 F.2d 1213, 1216 (11th Cir. 1983).  Such prosecutorial misconduct, if "so pronounced and persistent that it permeates the entire atmosphere of the trial," requires reversal.

---

of Alabama to so convince you from the evidence."  Doc. 12, Vol. 8, Tab 19 at 265.

> *United States v. Alanis*, 611 F.2d 123, 126 (5th Cir.), *cert. denied*, 445
> U.S. 955, 100 S. Ct. 1607, 63 L. Ed. 2d 791 (1980)(quoting *United
> States v. Blevins*, 555 F.2d 1236 (5th Cir. 1977), *cert. denied*, 434 U.S.
> 1016, 98 S. Ct. 733, 54 L. Ed. 2d 761 (1978)). Prosecutors must observe
> the distinction between the permissible practice of arguing evidence and
> suggesting inferences which the jury might draw from it and the
> impermissible practice of arguing suggestions beyond the evidence. *See
> Houston v. Estelle*, 569 F.2d 372, 380 (5th Cir. 1978). Additionally,
> prosecutors must refrain from making burden-shifting arguments which
> suggest that the defendant has an obligation to produce any evidence or
> to prove innocence. *See Winship*, 397 U.S. at 364, 90 S. Ct. at 1072. .
> . . "[T]he limits of proper argument find their source in notions of
> fairness, the same source from which flows the right to due process of
> law." *Houston*, 569 F.2d at 380.

*United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992).

Considering the prosecutor's statements in context, this court finds the prosecutor directed his statement at defense counsel and their offered explanations for the circumstantial evidence. The statements did not have the effect of shifting the burden of proof to Broadnax. But, even if it did, because "the prejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof," *Simon,* 964 F.2d at 1087 (citing, *inter alia*, *Duncan*, 704 F.2d at 1216 (11th Cir.1983)), any alleged error was rendered harmless by the trial court's instructions to the jury that the State, and not Broadnax, had the burden to prove each element of each count. *See* doc. 12, Vol. 8, Tab 19 at 253-54, 265, 347. Therefore, the ACCA's holding, that the prosecutor

had "not attempt[ed] to shift the burden of proof to Broadnax," *Broadnax*, 825 So. 2d at 185, was not unreasonable. Alternatively, the ACCA's determination that any possible prejudice was cured by the trial court's instructions regarding the burden of proof was not unreasonable in light of existing Supreme Court precedent.

### 3. Whether the Prosecutor Fabricated a Conversation Between Broadnax and Det. Cunningham (Claim L)

Broadnax argues also that the prosecutor violated his constitutional rights when she made the following statements in closing:

> [Broadnax] tells Vince [Cunningham] – he's got an answer for everything. Blood on the uniform at the third interview: 'Oh, Man, somebody had stolen my uniform, and I had let the uniform company know.' Well, what do we know? That's a lie.
>
> Well, what about the blood on your boots, Donald?
>
> Oh, I sold those to a white guy about a year ago.
>
> An answer for everything. And we know that it is all one big lie.
>
> Is he lying just because for some reason he left the work release center to go and have a drink or to go and do something else? Absolutely not. He's lying because he's guilty of murder. Not one, but two.

Doc. 1 at 103-04; doc. 12, Vol 8, Tab 18 at 237-38. As Broadnax puts it, "[t]he prosecutor created this argument to make it appear that Mr. Broadnax was actively lying to the police in response to their questions," and, in fact, "Mr. Broadnax [had]

made a voluntary statement telling the police what happened to the items they had previously asked him about." Doc. 1 at 103-04.

In rejecting Broadnax's claim, the ACCA held that "the prosecutor was merely attacking the credibility of Broadnax's statement to law enforcement officers," that "[t]hese comments are within the scope of legitimate closing argument," and that "the prosecutor was arguing her interpretation of the evidence presented to refute Broadnax's statement; we find no plain error." *Broadnax*, 825 So. 2d at 185-86 (internal citations omitted). Broadnax contends that this finding that "the prosecution's fabricated conversation was proper is an unreasonable application of United States Supreme Court precedent." Doc. 1 at 103-04 (citing *Miller v. Pate*, 386 U.S. 1, 7 (1967); *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974)).

This court's "inquiry is limited to whether the state court unreasonably applied a holding of the Supreme Court, *Williams* [*v. Taylor*], 529 U.S. [362,] 412, 120 S. Ct. [1495,] 1523 [(2000)], and the Supreme Court has never held that a prosecutor's closing arguments were so unfair as to violate the right of a defendant to due process." *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287 (11th Cir. 2012). "The clearly established Federal law relevant here is [the Court's] decision in *Darden v. Wainwright,* 477 U.S. 168, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986), which explained that a prosecutor's improper comments will be held to violate the

Constitution only if they so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Parker v. Matthews*, 567 U.S. 37, 45 (2012)(quoting *Darden*, 477 U.S. at 181 (quoting *Donnelly,* 416 U.S. at 643)). And, in this Circuit, to prevail "the defendant must show a reasonable probability that, but for the prosecutor's statements, the result of the proceeding would have been different." *Davis v. Zant*, 36 F.3d 1538, 1545 (11th Cir. 1994) (citations omitted).

This court has reviewed the trial testimony and finds that the evidence supports the prosecutor's argument about Broadnax's responses to Det. Cunningham's questions regarding the uniform and boots. The prosecutor's argument accurately summarized Det. Cunningham's testimony that he asked Broadnax about the blood on the boots and the uniform during the third interview, and that Broadnax informed him that he sold the boots about a year before the murders to a "white guy," and that someone had stolen his uniform and that he reported the theft to the uniform company.[44] Broadnax has not shown that the prosecutor's "conversation" was fabricated – Det. Cunningham indeed testified that Broadnax had responded to his questions regarding the boots and the uniform in the manner argued by the prosecutor during rebuttal. And, the prosecutor's argument

---

[44]Jimmy Wood, a representative from the uniform company, testified that he never received a report from Broadnax or anyone else about a stolen or missing uniform. Doc. 12, Vol. 6 at 647, 654-55.

closely followed Det. Cunningham's testimony, and, in that respect, she did not mislead or confuse the jury, even if she did not precisely quote Det. Cunningham's questions and Broadnax's responses.

To close, Broadnax has not shown that the prosecutor's argument was improper, and has not established that any alleged improper argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Parker*, 567 U.S. at 45. Therefore, this claim for habeas relief is also due to be denied.

## CONCLUSION

Broadnax has not shown that the state appellate court's ruling was "objectively unreasonable," *Virginia v. LeBlanc*, 137 S. Ct. at 1728, or that no "fairminded jurists could agree with the state court's decision," *Loggins*, 654 F.3d at 1220. Therefore, Broadnax's claims are due to be denied and his Petition is due to be dismissed. An Order dismissing Broadnax's Petition for Writ of Habeas Corpus by Prisoner in State Custody Under Death Sentence Pursuant to 28 U.S.C. §2254, doc. 1, will be entered contemporaneously with this Memorandum Opinion.

**DONE** and **ORDERED** this 13th day of December, 2019.

_____
ABDUL K. KALLON
UNITED STATES DISTRICT JUDGE